**PITTSBURG & MIDWAY COAL MINING COMPANY,**
Plaintiff–Appellee,

v.

**Derrick WATCHMAN; Victor Joe; Lee Bergen; Bruce Keizer; Joe Shirley, Individually and as members of the Navajo Tax Commission; Ronnye Etcitty, Individually and as Deputy Director of the Navajo Tax Commission, Defendants–Appellants,**

**United States of America; Ray Powell, Commissioner of Public Lands for the State of New Mexico; Santa Fe Pacific Railroad Company; Santa Fe Pacific Gold Corporation; New Mexico Oil and Gas Association, Amici Curiae.**

No. 94–2060.

United States Court of Appeals,
Tenth Circuit.

April 19, 1995.

Rehearing and Suggestion for Rehearing In Banc Denied May 23, 1995.

1532

Paul E. Frye (Lisa M. Enfield, Nordhaus, Haltom, Taylor, Taradash & Frye, Albuquerque, NM, Herb Yazzie, Atty. Gen., and Marcelino Gomez, Navajo Nation Dept. of Justice, Window Rock, AZ, with him on the briefs), Nordhaus, Haltom, Taylor, Taradash & Frye, Albuquerque, NM, for defendants-appellants.

Christopher Lane (James G. di Zerega and Kent R. Olson, The Pittsburg & Midway Coal Mining Co., Englewood, CO, with him on the brief), Sherman & Howard L.L.C., Denver, CO, for plaintiff-appellee.

Lois J. Schiffer, Acting Asst. Atty. Gen., Edward J. Shawaker and John T. Stahr, Attys., Dept. of Justice, Washington, DC, and Tim Vollmann, Regional Sol., U.S. Dept. of Interior, Albuquerque, NM, on the brief for amicus curiae U.S.

Lynn H. Slade and Walter E. Stern, Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, NM, on the brief for amici curiae Santa Fe Pacific R. Co. and Santa Fe Pacific Gold Corp., Edmund H. Kendrick and Galen M. Buller, Montgomery & Andrews, P.A., Santa Fe, NM, on the brief for amicus curiae New Mexico Oil and Gas Ass'n.

Harry N. Relkin, Sp. Asst. Atty. Gen., Santa Fe, NM, on the brief for Amicus Curi-

ae Ray Powell, Com'r of Public Lands for the State of N.M.

Before MOORE and BARRETT, Circuit Judges; and DOWNES, District Judge.*

JOHN P. MOORE, Circuit Judge.

This case represents the second time this controversy has appeared before us. In 1986, the Pittsburg & Midway Coal Mining Company (P & M) filed an action in federal court seeking an injunction and declaratory judgment that the Navajo Nation lacked jurisdiction to impose its Business Activities Tax on the "source gains" from P & M's South McKinley Mine.[1] The Navajo Nation replied the federal court should abstain based on the tribal abstention doctrine, allowing the tribal court to hear the issue first. The Tribe offered two different theories in support of its position.

First, the land area containing the mine was part of the Navajo Reservation. In *Pittsburg & Midway Coal Mining Co. v. Yazzie,* 909 F.2d 1387 (10th Cir.), *cert. denied,* 498 U.S. 1012, 111 S.Ct. 581, 112 L.Ed.2d 586 (1990) (*Pittsburg & Midway I* ), we rejected the Navajo Nation's first contention.[2] We held the 1907–08 expansion of the Navajo Reservation by approximately 1.9 million acres was diminished by two subsequent Executive Orders issued in 1908 and 1911. *Id.* at 1422. Therefore, the mine was not on reservation land.

Second, the Tribe argued the tribal abstention doctrine applied because the area was Indian country within the meaning of 18 U.S.C. § 1151. Because the district court did not reach this issue, we did not consider it in the first appeal. Instead, we directed the district court to address the issue on remand, which it has now done. The district court held the area in question was not Indian country, making it inappropriate to dismiss P & M's complaint for failure to exhaust tribal remedies. We now reverse and remand for further factual findings by the district court.

## I. BACKGROUND

The South McKinley Mine is located outside the Navajo Reservation in northwestern New Mexico near the Arizona–New Mexico border. The mine is directly adjacent to a companion mine located within the formal Navajo Reservation boundary. The mine consists of approximately 15,677.40 acres or 20 to 25 square miles. The parties have stipulated before the district court about the title of the surface and subsurface estates where the mine is located.

Five interests each have an ownership share in part of the surface title to the mine site area: (1) the United States holds title to 7,347.23 acres or approximately 47% in trust for individual Navajo allottees with the Bureau of Indian Affairs (BIA) acting as trustee; (2) non-Indian private parties including P & M hold title to 6,303.68 acres or 40%; (3) the Navajo Nation holds title to 1,131.46 acres or 7%; (4) the United States holds title to 830.94 acres or 5% as public lands managed by the Bureau of Land Management (BLM); and (5) the State of New Mexico holds title to 64.09 acres or less than 0.5%.

In contrast, three interests each own part of the subsurface coal estate: (1) the United States holds title to 8,178.17 acres or 52%; (2) Cerillos Land Company, the successor in interest to the Santa Fe Pacific Railroad, holds title to 7,430.14 acres or 47%; and (3) the State of New Mexico holds title to 64.09 acres or less than 0.5%. P & M has leased the right to conduct its mining operations from these various titleholders. None of the subsurface coal rights are owned by, or held

---

* The Honorable William F. Downes, United States District Court Judge for the District of Wyoming, sitting by designation.

1. Derrick Watchman is the Executive Director of the Navajo Tax Commission. While he is the named party in this case, throughout this opinion we refer to the appellants as the Navajo Nation or the Tribe.

2. For purposes of argument and consideration, *Pittsburg & Midway Coal Mining Co. v. Yazzie,* 909 F.2d 1387 (10th Cir.), *cert. denied,* 498 U.S. 1012 (1990), was companioned with *Blatchford v. Sullivan,* 904 F.2d 542 (10th Cir.1990), *cert. denied,* 498 U.S. 1035, 111 S.Ct. 699, 112 L.Ed.2d 689 (1991), a habeas corpus case that raised the identical reservation diminishment issue.

in trust for, the Navajo Nation or any individual Navajos.

The Navajo Nation's Business Activities Tax imposes a 5% levy on source gains, less certain deductions, derived from commercial activities within the Tribe's jurisdiction. The Navajo Tax Commission administers the complicated statutory scheme. Navajo Trib. Code, tit. 24, §§ 401–445 (1985 Supp.). P & M has continued to pay this tax under protest during the pendency of this litigation.

Our remand instructions to the district court were:

> We remand for consideration of whether some or all of P & M's South McKinley Mine is within Indian country under 18 U.S.C. §§ 1151(b) or (c) and, if so, whether the court is obligated to abstain from initially deciding whether the Tribe can tax P & M's source gains from the mine.

*Pittsburg & Midway I,* 909 F.2d at 1422. In fulfilling these instructions, the district court applied the following statutory definition of Indian country:

> 18 U.S.C. § 1151. Indian country defined
>
> Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

In its Memorandum Opinion and Order, the district court first concluded, "[t]he Tenth Circuit ruled the mine site is outside the reservation. The site does not fall within an Indian allotment. Therefore, the site is part of 'Indian country' only if it is a dependent Indian community." *Pittsburg & Midway Coal Mining Co. v. Watchman,* No. 86–

1442–M at 3 (D.N.M. June 11, 1993) (*Memorandum Opinion* ). The district court then applied this court's test for determining a dependent Indian community, *Blatchford v. Sullivan,* 904 F.2d 542 (10th Cir.1990), *cert. denied,* 498 U.S. 1035, 111 S.Ct. 699, 112 L.Ed.2d 689 (1991), using the South McKinley Mine site for its analysis. The court rejected the Tribe's suggestion that the Tsayatoh Chapter was the appropriate community of reference.[3] *Memorandum Opinion,* at 3–5. Applying *Blatchford,* the district court concluded the mine site was not a dependent Indian community within the meaning of 18 U.S.C. § 1151(b). *Id.* at 5–7.

After the court's order, the Navajo Nation filed a motion to alter or amend the judgment pursuant to Fed.R.Civ.P. 59. Responding to this motion, the district court concluded:

> The parties have stipulated that 47% of the surface right[s] of the mine are held in trust by the United States for Navajo allottees and an additional 7% of the surface is held by the Navajo Tribe. The allotments are Indian country by definition under 18 U.S.C. § 1151(c). However, I declined to find that the mine was in Indian country for purposes of removing this case to the jurisdiction of the Tribal Court, and I decline to alter or amend the judgment in response to defendants' motion.

*Pittsburg & Midway Coal Mining Co. v. Watchman,* No. 86–1442–M at 1–2 (D.N.M. Jan. 19, 1994) (*Rule 59 Order* ). Because the district court concluded the mine was not located in Indian country, it did not reach the issue of whether the tribal abstention doctrine or one of its three exceptions applied in this case.

On appeal, the Navajo Nation raises three issues. First, the Tribe argues the district court should have abstained pursuant to the tribal abstention doctrine until P & M had exhausted all its available tribal remedies. The Navajo Nation contends none of the three exceptions to the tribal abstention doctrine are applicable. Second, the Nation argues the district court erred in concluding that none of the South McKinley Mine site is

---

**3.** The Tsayatoh Chapter is a local governmental    subunit of the Navajo Nation.

within a Navajo trust allotment. The 48 trust allotments making up 47% of the land area of the mine are by definition Indian country under 18 U.S.C. § 1151(c). The Tribe specifically points to the seemingly irreconcilable inconsistency between the court's conclusions the trust allotments are definitionally Indian country, and the mine is not located in Indian country. Third, the Navajo Nation believes the district court incorrectly chose the mine site itself as the community of reference for its dependent Indian community analysis. The entire Tsayatoh Chapter should have been used instead.[4]

In response, P & M first argues the tribal abstention doctrine should not be applied because "the action is patently violative of express jurisdictional prohibitions." *National Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 856 n. 21, 105 S.Ct. 2447, 2454 n. 21, 85 L.Ed.2d 818 (1985). As a dependent sovereign, the Tribe has no inherent authority to regulate non-Indian activities on non-Indian lands, and Congress did not delegate civil jurisdiction over Indian country to the Navajo Nation when it enacted 18 U.S.C. § 1151. Second, P & M argues the mine site does not fall within 18 U.S.C. § 1151(c) because neither the Navajo Nation nor any individual Navajo allottee has any interest in the subsurface coal estate. The statute contemplates a title-based jurisdictional nexus. Because the Tribe is attempting to tax the source gains from P & M's coal mining activities, there must be Indian title

or a trust relationship to the subsurface coal estate to establish its jurisdiction. Third, P & M contends the court properly chose the mine site as the community of reference for its dependent Indian community analysis. The South McKinley Mine site area has a use, purpose, and economic life separate from the adjacent area. P & M asserts the mine site and the surrounding area have not been established as a dependent Indian community.

## II. PURPOSES OF THE TRIBAL ABSTENTION DOCTRINE

We begin our analysis with an overview of the purposes and policies behind the tribal abstention doctrine, placing the issues involved in the case in the proper context. The Supreme Court originally articulated the tribal abstention doctrine in *National Farmers*, advancing a variety of policy reasons in support of the rule that a federal court should abstain until the tribal courts have had the initial opportunity to consider a particular matter. First, Congress' long-standing commitment to tribal self-government and self-determination, including the development of independent tribal courts, supported the doctrine. Second, the orderly administration of justice would be advanced by allowing the tribal courts to develop a full record. Third, federal courts reviewing tribal court decisions would have the benefit of their expertise. *National Farmers*, 471 U.S.

---

4. In conjunction with the instant appeal, the Navajo Nation filed a motion pursuant to Fed. R.App.P. 27 asking this court to partially recall its earlier mandate in *Pittsburg & Midway I*. The Tribe asks us not to apply the doctrine of the law of the case so that the reservation diminishment issue decided there may be reexamined. The law of the case is a judicial doctrine designed to promote decisional finality. Once a court decides an issue, the doctrine comes into play to prevent the re-litigation of that issue in subsequent proceedings in the same case. *Arizona v. California*, 460 U.S. 605, 618–19, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983); *United States v. Monsisvais*, 946 F.2d 114, 115–16 (10th Cir. 1991). The Navajo Nation is correct that unlike the doctrines of res judicata or collateral estoppel, "the law of the case doctrine has long been considered only a rule of practice in the courts and not a limit on their power." *Id.* at 116.

Nevertheless, the circumstances justifying a departure from the law of the case are narrow. The most widely quoted statement is by former Tenth Circuit Chief Judge Orie Phillips, sitting in another circuit, that the law of the case must be followed "unless the evidence on a subsequent trial was substantially ·different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." *Id.* at 117 (quoting *White v. Murtha*, 377 F.2d 428, 432 (5th Cir.1967)); *see also Major v. Benton*, 647 F.2d 110, 112 (10th Cir.1981). We are persuaded that none of these three circumstances exist in the instant case, and therefore deny the Tribe's motion.

at 856–57, 105 S.Ct. at 2454.[5] The Court has determined "[e]xhaustion is required as a matter of comity, not as a jurisdictional prerequisite." *Iowa Mutual Ins. Co. v. LaPlante*, 480 U.S. 9, 16 n. 8, 107 S.Ct. 971, 976 n. 8, 94 L.Ed.2d 10 (1987); *Tillett v. Lujan*, 931 F.2d 636, 640 (10th Cir.1991). Together, these policies "favor[ ] a rule that will provide the forum whose jurisdiction is being challenged the first opportunity to evaluate the factual and legal bases for the challenge." *National Farmers*, 471 U.S. at 856, 105 S.Ct. at 2454.

■ We believe the tribal abstention doctrine applies throughout Indian country, not just on formal reservations.[6] However, the application of the doctrine may differ outside the formal boundaries of a reservation. The facts and circumstances of each individual situation will determine whether comity requires abstention in that particular instance. *Texaco, Inc. v. Zah*, 5 F.3d 1374, 1378 (10th Cir.1993).[7] The policies behind abstention are most strongly implicated when a federal court action is brought after a tribal court action has already been filed. This was true in both *National Farmers* and *Iowa Mutual*, where the exhaustion of tribal remedies was an "inflexible bar to consideration of the merits" by the federal court requiring dismissal. *Granberry v. Greer*, 481 U.S. 129, 131 and n. 4, 107 S.Ct. 1671, 1673 and n. 4, 95 L.Ed.2d 119 (1987); *Smith v. Moffett*, 947 F.2d 442, 445 (10th Cir.1991). "[T]he federal courts should not even make a ruling on tribal court jurisdiction ... until tribal remedies are exhausted." *Stock West, Inc. v.*

*Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1228 (9th Cir.1989).

This court and the Eighth Circuit have gone further by applying the tribal abstention doctrine where no tribal court action had been filed prior to the federal action. *See, e.g., Brown v. Washoe Hous. Auth.*, 835 F.2d 1327 (10th Cir.1988); *Moffett*, 947 F.2d at 444; *Weeks Constr., Inc. v. Oglala Sioux Hous. Auth.*, 797 F.2d 668 (8th Cir.1986). These courts concluded the policies supporting abstention were implicated, though to a lesser degree. This case falls farther down the sliding scale because it involves "non-Indian activity occurring outside the reservation." *Texaco*, 5 F.3d at 1378. Thus, "the policies behind the tribal exhaustion rule are not so obviously served." *Id.*

■ Our recent decision in *Texaco* provides a framework for our inquiry. We must "examine assiduously the *National Farmers* factors in determining whether comity requires the parties to exhaust their tribal remedies before presenting their dispute to the federal courts." *Id.* We conclude the application of the tribal abstention doctrine here would serve the policies articulated in *National Farmers* and *Iowa Mutual*. We examine each policy in turn.

First, the Supreme Court has recognized that Congress' commitment to tribal self-government supports the tribal abstention doctrine. *National Farmers*, 471 U.S. at 856, 105 S.Ct. at 2454. "The federal policy of promoting tribal self-government encompasses the development of the entire tribal court system...." *Iowa Mutual*, 480 U.S. at 16–

---

5. These last two reasons are similar to those advanced in support of the identical exhaustion requirement of administrative law. *See generally McKart v. United States*, 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969); 2 Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 15.2 (3d ed. 1994).

6. We note, the discussions in this part and part III of our opinion assume the South McKinley Mine is located in Indian country.

7. We do not believe our analysis conflicts with the Supreme Court's recent decision in *Oklahoma Tax Comm'n v. Sac & Fox Nation*, —— U.S. ——, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993). There, in addressing Oklahoma's taxing authori-

ty, the Court rejected any distinction between formal reservations and Indian country. *Id.* at ——, 113 S.Ct. at 1991.

Absent explicit congressional direction to the contrary, we presume against a State's having the jurisdiction to tax within Indian country, whether the particular territory consists of formal or informal reservation, allotted lands, or dependent Indian communities.

*Id.* at ——, 113 S.Ct. at 1993. The Court's analysis in *Sac & Fox Nation* supports our conclusion that the tribal abstention doctrine applies throughout Indian country. However, we do not believe it conflicts with our additional conclusion that the application of the doctrine differs depending on the degree Indian affairs are implicated in a particular case.

17, 107 S.Ct. at 976–77. . If exhaustion is not required, the legitimacy and independence of the tribal court system come into serious question. Allowing litigants to bypass tribal institutions simply by filing an action in federal court would undercut the tribal court system. "[U]nconditional access to the federal forum would place it in direct competition with the tribal courts, thereby impairing the latter's authority...." *Iowa Mutual,* 480 U.S. at 16, 107 S.Ct. at 976 (citing *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 59, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978); *Fisher v. District Court,* 424 U.S. 382, 388, 96 S.Ct. 943, 947, 47 L.Ed.2d 106 (1976)).

The policy of tribal self-government is clearly implicated here. P & M's lawsuit makes a facial, jurisdictional challenge to the Navajo Nation's exercise of its taxing authority which is a basic attribute of its sovereignty.

> The power to tax is an essential attribute of Indian sovereignty because it is a necessary instrument of self-government and territorial management. This power enables a tribal government to raise revenues for its essential services.... [I]t derives from the tribe's general authority, as sovereign, to control economic activity within its jurisdiction, and to defray the cost of providing governmental services by requiring contributions from persons or enterprises engaged in economic activities within that jurisdiction.

*Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 137, 102 S.Ct. 894, 901, 71 L.Ed.2d 21 (1982); *see also Washington v. Confederated Tribes of Colville Indian Reservation,* 447 U.S. 134, 152, 100 S.Ct. 2069, 2080–81, 65 L.Ed.2d 10 (1980); *Montana v. United States,* 450 U.S. 544, 565–66, 101 S.Ct. 1245, 1258–59, 67 L.Ed.2d 493 (1981); *Superior Oil Co. v. United States,* 798 F.2d 1324, 1329 (10th Cir.1986). We believe these cases support the proposition the power to tax is a sufficiently essential aspect of sovereignty to require P & M to initiate its jurisdictional challenge in Navajo tribal court. P & M benefits from the Navajo Nation's governmental services in conducting its mining operations to a degree adequate for the application of the doctrine of abstention to apply.

"Under these circumstances, there is nothing exceptional in requiring [P & M] to contribute through taxes to the general cost of tribal government." *Merrion,* 455 U.S. at 138, 102 S.Ct. at 902. It is even less exceptional to require P & M to initiate its challenge to the Tribe's taxing authority in tribal court.

Second, the Court has recognized "the orderly administration of justice in the federal court will be served by allowing a full record to be developed in the Tribal Court before either the merits or any question concerning appropriate relief is addressed." *National Farmers,* 471 U.S. at 856, 105 S.Ct. at 2454. We conclude this prudential policy consideration for practicality and judicial efficiency is implicated in this case. It simply makes good policy sense to allow tribal administrative agencies and courts to develop the decisional matrix prior to federal court consideration. We believe, "the Tribe itself is in the best position to develop the necessary factual record for disposition on the merits." *Burlington Northern R.R. Co. v. Crow Tribal Council,* 940 F.2d 1239, 1246 (9th Cir.1991). This is particularly true because P & M's lawsuit presents a direct challenge to the Navajo Nation's jurisdiction and involves the interpretation of Navajo law. *Compare Altheimer & Gray v. Sioux Mfg. Corp.,* 983 F.2d 803, 814 (7th Cir.) (concerning the application of a federal statute to a private, commercial letter of intent), *cert. denied,* —— U.S. ——, 114 S.Ct. 621, 126 L.Ed.2d 585 (1993). A myriad of legal and factual sources must be consulted to resolve the complicated and intertwined issues implicated in cases like this one.

> [T]he existence and extent of a tribal court's jurisdiction will require a careful examination of tribal sovereignty, the extent to which that sovereignty has been altered, divested, or diminished, as well as a detailed study of relevant statutes, Executive Branch policy as embodied in treaties and elsewhere, and administrative or judicial decisions.

*National Farmers,* 471 U.S. at 855–56, 105 S.Ct. at 2453–54. Resolution of these issues also requires close examination of the historical and present-day status of the area in question. Thus, the Court's ultimate conclu-

sion in *National Farmers* that this "examination should be conducted in the first instance in the Tribal Court itself," *id.* at 856, 105 S.Ct. at 2454, is particularly applicable here.

Third, the Court concluded later federal review would benefit from tribal court expertise. *Id.* at 857, 105 S.Ct. at 2454. Ultimately, P & M may seek review of any tribal court decision in federal district court after it has exhausted its available tribal remedies. *Id.* at 853, 105 S.Ct. at 2452; *Iowa Mutual,* 480 U.S. at 19, 107 S.Ct. at 978. Tribal expertise will facilitate the efficient and practical administration of justice for essentially the same reasons discussed above. We believe this policy is also implicated here.

In summary, we hold the tribal abstention doctrine applies in this case. Our analysis of the *National Farmers* and *Iowa Mutual* policies leads us to conclude comity dictates that P & M exhaust its available tribal remedies before proceeding in federal court. The district court must abstain if the South McKinley Mine lies within Indian country.

## III. EXCEPTIONS TO THE TRIBAL ABSTENTION DOCTRINE

■ We next consider whether any of the three exceptions to the tribal abstention doctrine are applicable. *National Farmers,* 471 U.S. at 856 n. 21, 105 S.Ct. at 2454 n. 21. Because of its disposition, the district court did not address those exceptions. "It is a general rule that a federal appellate court will not consider an issue 'which was not presented to, considered or decided by the trial court.'" *Cavic v. Pioneer Astro Indus., Inc.,* 825 F.2d 1421, 1425 (10th Cir.1987) (quoting *Eureka–Carlisle Co. v. Rottman,* 398 F.2d 1015, 1019 (10th Cir.1968)). However, under the individual circumstances of a particular case, this rule may be relaxed. "The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton v. Wulff,* 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d

826 (1976); *see generally Lyons v. Jefferson Bank & Trust,* 994 F.2d 716 (10th Cir.1993).

We believe this case is an appropriate candidate for the exercise of our discretion to decide an issue not reached by the district court. First, the applicability of the *National Farmers* exceptions were presented to and considered by the district court. However, the court did not decide this issue because of its initial determination the mine was not in Indian country. Second, this issue has been fully briefed on appeal. *Colorado Interstate Corp. v. CIT Group/Equip. Fin., Inc.,* 993 F.2d 743, 751 (10th Cir.1993) (issue being fully briefed on appeal supported appellate court consideration). Third, this issue involves a question of law that does not require any further factual findings by the district court. *Id.* Fourth, interests of justice and notions of judicial economy are implicated here. P & M filed this lawsuit in 1986, and this is the second time we have considered an appeal. We believe justice will be served by our resolution of this issue now rather than allowing piecemeal aspects of this dispute to continue to percolate in the various federal courts. *Hormel v. Helvering,* 312 U.S. 552, 556–58, 61 S.Ct. 719, 721–22, 85 L.Ed. 1037 (1941).[8]

■ In announcing the tribal abstention doctrine, the Court also outlined three instances where it would not apply.

> We do not suggest that exhaustion would be required where an assertion of tribal jurisdiction "is motivated by a desire to harass or is conducted in bad faith," *cf. Juidice v. Vail,* 430 U.S. 327, 338, 97 S.Ct. 1211, 1218, 51 L.Ed.2d 376 (1977), or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of an adequate opportunity to challenge the court's jurisdiction.

*National Farmers,* 471 U.S. at 856 n. 21, 105 S.Ct. at 2454 n. 21; *see also Iowa Mutual,* 480 U.S. at 18–19 and n. 12, 107 S.Ct. at 977–78 and n. 12; *Bank of Oklahoma v. Muscogee (Creek) Nation,* 972 F.2d 1166 (10th Cir. 1992). P & M does not raise claims of bad

---

8. We do not believe our final disposition of this appeal contradicts this analysis. Our remand to the district court on the dependent Indian com-

munity issue is essentially limited to the resolution of factual issues and their application to the legal framework outlined in this opinion.

faith or futility. Therefore, neither the first nor the third exception is at issue. P & M's sole claim, under the second exception, is that the Navajo Nation's attempt to tax the source gains from the South McKinley Mine is "patently violative of express jurisdictional prohibitions." *National Farmers*, 471 U.S. at 856 n. 21, 105 S.Ct. at 2454 n. 21.

The proper scope of the tribal abstention doctrine is a question of law we review de novo. *Texaco*, 5 F.3d at 1376. P & M is correct that the Navajo Nation as a dependent sovereign lacks the inherent authority of a full-fledged sovereign. P & M relies upon a variety of cases, all concerning the inherent authority of Indian tribes, for its conclusion the Navajo Nation has no authority to regulate non-Indian activities on non-Indian lands.[9] Nonetheless, we believe P & M mischaracterizes the nature of this issue. The question is not whether the Navajo Nation possesses inherent authority as a sovereign to tax P & M, but whether 18 U.S.C. § 1151 is a Congressional delegation of this authority throughout Indian country. As such, the cases P & M cites are inapposite.

P & M argues 18 U.S.C. § 1151 defines Indian country solely for criminal jurisdiction purposes. However, both the Supreme Court and this court have concluded § 1151 defines Indian country for both civil and criminal jurisdiction purposes. The Court first came to this conclusion in *DeCoteau v. District County Court*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). "While § 1151 is concerned, on its face, only with criminal jurisdiction, the Court has recognized that it generally applies as well to questions of civil jurisdiction." *Id.* at 427 n. 2, 95 S.Ct. at 1085 n. 2. The Court has reaffirmed this principle in subsequent cases. *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 n. 5, 107 S.Ct. 1083, 1088 n. 5, 94 L.Ed.2d 244 (1987); *Oklahoma Tax Comm'n v. Sac & Fox Nation*, — U.S. —, —, 113 S.Ct. 1985, 1991, 124 L.Ed.2d 30 (1993) (state could not exercise taxing authority over tribal members living in Indian country). We have consistently followed *DeCoteau*. See, e.g., *Indian Country U.S.A., Inc. v. Oklahoma*, 829 F.2d 967, 973 (10th Cir.1987), *cert. denied*, 487 U.S. 1218, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988); *Citizen Band Potawatomi Indian Tribe v. Oklahoma Tax Comm'n*, 888 F.2d 1303, 1305–07 (10th Cir.1989), *aff'd in part and rev'd in part on other grounds*, 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991); *Buzzard v. Oklahoma Tax Comm'n*, 992 F.2d 1073, 1076 (10th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 555, 126 L.Ed.2d 456 (1993); *Texaco*, 5 F.3d at 1376 n. 3; *Sac & Fox Nation v. Oklahoma Tax Comm'n*, 7 F.3d 925, 926 (10th Cir.1993).[10]

---

**9.** P & M cites: *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); *Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989); *South Dakota v. Bourland*, — U.S. —, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993); *UNC Resources, Inc. v. Benally*, 514 F.Supp. 358 (D.N.M.1981); *UNC Resources, Inc. v. Benally*, 518 F.Supp. 1046 (D.Ariz.1981).

**10.** Faced with these precedents, P & M argues the *DeCoteau* footnote is only dictum. *DeCoteau v. District County Court*, 420 U.S. 425, 427 n. 2, 95 S.Ct. 1082, 1085 n. 2, 43 L.Ed.2d 300 (1975). The subsequent Supreme Court and Tenth Circuit cases following *DeCoteau* simply have repeated this general statement without analysis. P & M supports this contention by asserting the four cases cited in the *DeCoteau* footnote do not support the proposition that § 1151 applies to civil cases. *General Motors Acceptance Corp. v. Chischilly*, 96 N.M. 113, 628 P.2d 683, 685 (1981) ("While this footnote may be read to support this theory, it is ambiguous and the cases cited in support of the statements in the footnote

do not refer to any civil application of 18 U.S.C. § 1151."); *People of South Naknek v. Bristol Bay Borough*, 466 F.Supp. 870, 877 n. 11 (D.Alaska 1979) ("This dictum in a footnote does not settle the issue of the extent to which the definition of 'Indian country' in the criminal statues applies to a question of tax jurisdiction. In addition, the authority for this proposition cited by the Court does not support it."). We believe the principle that § 1151 defines Indian country for both civil and criminal jurisdiction purposes is firmly established. Any suggestion to the contrary in *General Motors* and *South Naknek* is simply erroneous.

We note, incidentally, that even if we agreed with P & M that the *DeCoteau* footnote were dictum, we still would likely be bound by the Court's rationale. "[F]ederal courts 'are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when ... [the dicta] is of recent vintage and not enfeebled by any [later] statement.'" *City of Timber Lake v. Cheyenne River Sioux Tribe*, 10 F.3d 554, 557 (8th Cir.1993) (brackets in original), *cert. denied*, — U.S. —,

We conclude these precedents establish 18 U.S.C. § 1151 defines Indian country for civil jurisdiction purposes. We hold § 1151 represents an express Congressional delegation of civil authority over Indian country to the tribes. As a result, the Navajo Nation has authority to tax any mining activities taking place in Indian country without violating any express jurisdictional prohibitions. *National Farmers*, 471 U.S. at 856 n. 21, 105 S.Ct. at 2454 n. 21. None of the three exceptions to the tribal abstention doctrine adhere to prevent the district court from abstaining.

## IV. INDIAN COUNTRY

When applied to this case, these principles indicate if the South McKinley Mine site is located in Indian country, the district court must abstain until P & M exhausts all their available tribal remedies. We hold the mine is at least in part located in Indian country. We reach this conclusion based on the combination of two circumstances. First, the United States holds 47% of the mine site area in trust for individual Navajo allottees. These Navajo trust allotments are Indian country by definition under 18 U.S.C. § 1151(c). Second, the mine site and the surrounding area may constitute a dependent Indian community within the meaning of 18 U.S.C. § 1151(b).

Unfortunately, the factual record is not sufficiently developed for us to determine whether the mine site is part of a dependent Indian community. Thus, we must remand once again for the district court to make this initial determination.

We do not believe these two definitions of Indian country are mutually exclusive. When read together, they support our holding that the tribal abstention doctrine may apply in the instant case. The combination of nearly half of the mine's being located within individual Navajo trust allotments and the mine and the surrounding area's being a dependent Indian community would sufficiently implicate Navajo interests to invoke the doctrine. Ultimately, however, the question of whether abstention is required depends on the district court's factual determi-

nations on the dependent Indian community issue.

## A. TRUST ALLOTMENTS

We review de novo the district court's legal conclusion the South McKinley Mine site is not within Indian country under 18 U.S.C. § 1151(c). *Blatchford*, 904 F.2d at 544. The parties have stipulated concerning the title to the mine's surface area, so we are reviewing the court's legal conclusions drawn from these undisputed facts. *United States v. Morgan*, 614 F.2d 166, 170 (8th Cir.1980).

The plain language of 18 U.S.C. § 1151(c) defines Indian country to include: "all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." (emphasis added). Congress amended this statute to conform to the Supreme Court's decision in *United States v. Pelican*, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914), which determined that individual Indian allotments held in trust by the United States were subject to federal jurisdiction. *See also United States v. Ramsey*, 271 U.S. 467, 471–72, 46 S.Ct. 559, 560, 70 L.Ed. 1039 (1926). Subsequently, courts have consistently held individual Indian allotments fall within the definition of Indian country under § 1151(c). *Solem v. Bartlett*, 465 U.S. 463, 467 and n. 8, 104 S.Ct. 1161, 1164 and n. 8, 79 L.Ed.2d 443 (1984); *United States v. Burnett*, 777 F.2d 593, 596–97 (10th Cir.1985), *cert. denied*, 476 U.S. 1106, 106 S.Ct. 1952, 90 L.Ed.2d 361 (1986); *Pittsburg & Midway I*, 909 F.2d at 1420–21. "[T]he allotments of individual citizens are Indian country within the express terms of § 1151(c)." *United States v. Sands*, 968 F.2d 1058, 1062 (10th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 987, 122 L.Ed.2d 139 (1993). The 48 trust allotments comprising 47% of the surface area of the mine fall within this definition.

As the Navajo Nation points out, the district court's two orders in this case are difficult to reconcile. Initially, the court concluded, "[t]he site does not fall within an Indian allotment." *Memorandum Opinion*, at 3.

114 S.Ct. 2741, 129 L.Ed.2d 861 (1994) (quoting *McCoy v. Massachusetts Inst. of Tech.*, 950 F.2d

13, 19 (1st Cir.1991), *cert. denied*, 504 U.S. 910, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992)).

However, in its second ruling, the court recognized the parties had stipulated that 47% of the surface area of the mine was held in trust for individual Navajos by the United States. The court also acknowledged these allotments were specifically defined as Indian country by 18 U.S.C. § 1151(c). However, the court "declined to find that the mine was located in Indian country for purposes of removing this case to the jurisdiction of the Tribal Court...." *Rule 59 Order,* at 1–2.

■ There are at least two possible explanations for the district court's two orders. First, the court may have concluded because the South McKinley Mine site did not fall within a single allotment, § 1151(c) did not apply. We have found no case law supporting this position, however. Second, perhaps the district court was implicitly suggesting the *National Farmers* policies were not sufficiently implicated in this case. If so, the court should have explicitly reached this conclusion. We reject the court's "implicit suggestion" because it conflicts with our analysis in Part II of this opinion.

■ On appeal, P & M does not attempt to defend or reconcile the district court's orders. Neither P & M nor any of the amici curiae dispute that Navajo allotments represent 47% of the surface area where the mine is located. Instead, P & M argues the South McKinley Mine does not fall within 18 U.S.C. § 1151(c) because neither the Navajo Nation nor any individual Navajo allottee holds title to any of the subsurface coal estate. P & M offers no citations in support of its rather novel theory, and we have been unable to find any, either. If we were to accept P & M's argument, jurisdiction would depend on commercial transactions between the United States, New Mexico, the Navajo Nation, and various private parties. A particular parcel of land, or even an individual stick in the

bundle of property rights, could suddenly change jurisdictions as a result of a single commercial transaction. This is an untenable prospect. Such a result would unnecessarily complicate already convoluted jurisdictional questions throughout the West. *See generally* Paul W. Gates, *History of Public Land Law Development* (1968).

■ We hold that the 48 trust allotments comprising 47% of the surface area of the South McKinley Mine site are Indian country by definition under 18 U.S.C. § 1151(c). However, we believe the individual Navajo's 47% interest by itself is not enough to trigger the tribal abstention doctrine.

As we discussed in Part II, the tribal abstention doctrine has its roots in comity. Federal courts should abstain when a suit sufficiently implicates Indian sovereignty or other important interests. We do not believe, however, the 47% stakehold of individual Navajo allottees, in and of itself, provides a sufficient nexus to require abstention in this lawsuit involving the entire South McKinley Mine.[11] However, we conclude this 47% interest combined with a subsequent district court finding the mine and the surrounding area is a dependent Indian community would support the application of the tribal abstention doctrine.

## B. DEPENDENT INDIAN COMMUNITY

We review de novo the district court's conclusion the South McKinley Mine site was not part of a dependent Indian community under 18 U.S.C. § 1151(b). *Blatchford,* 904 F.2d at 544. First, we consider the court's conclusion the mine site itself was the proper community of reference for its dependent Indian community analysis.[12] We conclude

---

11. Of course, if the entire mine was located on Navajo trust allotments, there would be no question about the doctrine's applicability. Similarly, abstention would apply if the controversy only involved the 47% of the mine site area of the trust allotments. In other words, we believe the Navajo Nation has the authority to apply its Business Activities Tax to the source gains from the 47% portion of the South McKinley Mine that lies within the individual Navajo trust allotments. We intentionally offer no opinion about what

percentage threshold of Indian interests would be necessary to trigger abstention. The resolution of that issue can await another day.

12. After reviewing several dependent Indian community cases, the district court reached the following conclusion: "The case law leads me to conclude that it is appropriate to assess the status of the mine site rather than the larger area of the Tsoyatoh (sic) Chapter." *Pittsburg & Midway Coal Mining Co. v. Watchman,* No. 86–1442–M at

the court erred by examining the mine site in isolation from the surrounding area. We remand for the district court to choose a more appropriate community of reference. Second, we delineate the four-part test the district court must use on remand to determine whether the South McKinley Mine site and the surrounding area is a dependent Indian community within the meaning of § 1151(b).

### 1. COMMUNITY OF REFERENCE

The issue of the proper community of reference for dependent Indian community analysis under § 1151(b) is a question of first impression. In *United States v. South Dakota,* 665 F.2d 837, 841–42 (8th Cir.1981), *cert. denied,* 459 U.S. 823, 103 S.Ct. 52, 74 L.Ed.2d 58 (1982), the court refused to consider South Dakota's argument the trial court had used the wrong community of reference for its analysis because the State had failed to raise the issue before the lower court. All other courts that have addressed a dependent Indian community issue have done so without having to answer the threshold question of the appropriate community to use.

The Supreme Court and the lower courts that have addressed dependent Indian community issues have done so in a variety of different contexts. The scope, size, and nature of what has been found to be a dependent Indian community within the meaning of 18 U.S.C. § 1151(b) do not provide much specific guidance. Large geographical areas have previously been determined to be dependent Indian communities. For example, the Court in *United States v. Sandoval,* 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913), held the Santa Clara Pueblo was a dependent Indian community. The Court described the pueblos as follows:

> There are as many as twenty Indian pueblos scattered over the state, having an aggregate population of over 8,000. The lands belonging to the several pueblos vary in quantity, but usually embrace about 17,-

000 acres, held in communal fee-simple ownership. . . .

*Id.* at 38–39, 34 S.Ct. at 3; *see also United States v. Candelaria,* 271 U.S. 432, 439–42, 46 S.Ct. 561, 562–63, 70 L.Ed. 1023 (1926); *United States v. Chavez,* 290 U.S. 357, 364–65, 54 S.Ct. 217, 220, 78 L.Ed. 360 (1933) (Pueblo of Isleta in New Mexico was Indian country by virtue of its dependent Indian community status). Similarly, we have previously held the entire Navajo community of Ramah, New Mexico, was a dependent Indian community. *United States v. Martine,* 442 F.2d 1022 (10th Cir.1971). In other circumstances, both the Supreme Court and the lower courts have concluded much smaller areas were dependent Indian communities. In *United States v. McGowan,* 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938), the Court held the Reno Indian Colony, "composed of several hundred Indians residing on a tract of 28.38 acres of land owned by the United States" was a dependent Indian community. *Id.* at 537, 58 S.Ct. at 287. The Eighth Circuit has concluded a single housing project in Sisseton, South Dakota, was a dependent Indian community. *South Dakota,* 665 F.2d at 843. Similarly, in *United States v. Mound,* 477 F.Supp. 156, 160 (D.S.D.1979), the court concluded the Cheyenne River Housing Authority project SD5–01 located in Eagle Butte, South Dakota, was a dependent Indian community.

█ We do not believe these cases support the district court's conclusion that "[e]ach case cited in *Blatchford* assessed the status of a relatively limited area." *Memorandum Opinion,* at 3. The existence of a dependent Indian community does not depend on the relative size of the geographical area.

█ The case law reveals at least two organizing principles useful for determining the community of reference. The first is the status of the area in question as a community. Several courts have applied the definition of community originally used in *Berry v. Arapahoe & Shoshone Tribes,* 420 F.Supp.

5 (D.N.M. June 11, 1993). P & M had argued the mine site itself was the proper community of reference, while the Navajo Nation advocated the Tsayatoh Chapter.

934 (D.Wyo.1976). *Blatchford,* 904 F.2d at 546; *Morgan,* 614 F.2d at 169–70.[13] The *Berry* court turned to a dictionary definition of community to inform its analysis: "Webster's New Collegiate Dictionary, (1975) defines a community as 'a unified body of individuals ... with common interests living in a particular area; ... an interacting population of various kinds of individuals in a common location.'" *Berry,* 420 F.Supp. at 940.[14] Applying this definition, the court concluded the Bull Lake Lodge, a private resort inholding in the Wind River Reservation, was not a community. The court found it was more properly characterized as a "place of business." *Id.* In *Morgan,* the court also discussed what constituted a community.

> Basic to the definitions of "community" which we have reviewed is the existence of an element of cohesiveness. This apparently can be manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality. Cohesiveness or common interests can be more necessary to the existence of a community than can mere density of population.

*Morgan,* 614 F.2d at 170.

P & M argues the South McKinley Mine represents the logical area of reference because it has a use, purpose, and economic life distinct from the surrounding area. The common and ordinary meaning of community, however, connotes something more than a purely economic concern. A community is a mini-society consisting of personal residences and an infrastructure potentially including religious and cultural institutions, schools, emergency services, public utilities, groceries, shops, restaurants, and the other needs, necessities, and wants of modern life. *See, e.g., Berry,* 420 F.Supp. at 940; *Blatchford,*

904 F.2d at 548–49. The mine site itself does not contain any of this infrastructure.

Second, dependent Indian community analysis focuses on the community of reference within the context of the surrounding area. In *Blatchford,* we examined the characteristics of Yah–Ta–Hey in McKinley County, New Mexico. *Blatchford,* 904 F.2d at 548–49. Our examination looked to the relationship of Yah–Ta–Hey to the surrounding area.

> The district court described Yah–Ta–Hey as a rural and 'readily identifiable residential and trading community' including the commercial establishments at the intersection of U.S. Highway 666 and State Highway 264, a small housing subdivision known as Navajo Estates, and the surrounding area within three to five miles of the intersection.

*Id.* at 548. We concluded Ya–Ta–Hey's infrastructure and essential services were provided jointly by the City of Gallup, McKinley County, and the State of New Mexico. *Id.* at 548. Similarly, in *Berry,* the court looked to Riverton, Wyoming, as "the nearest community of any size" that provided necessary services for the lodge. *Berry,* 420 F.Supp. at 940. In *United States v. Mission Golf Course, Inc.,* 548 F.Supp. 1177 (D.S.D.1982), *aff'd without opinion,* 716 F.2d 907 (8th Cir. 1983), *cert. denied,* 464 U.S. 1041, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984), the court analyzed whether the golf course was a non-Indian community by looking to the surrounding territory. *Id.* at 1183. In *United States v. Mazurie,* 419 U.S. 544, 549, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975), the Court analyzed the general Fort Washakie, Wyoming, area rather than solely focusing on the Blue Bull Bar to determine whether the bar was located in Indian country.

**13.** We note that *Berry v. Arapahoe & Shoshone Tribes,* 420 F.Supp. 934 (D.Wyo.1976), and *United States v. Morgan,* 614 F.2d 166 (8th Cir.1980), construe the meaning of "non-Indian communities" under 18 U.S.C. §§ 1154 and 1161. A non-Indian community, even located within a formal reservation boundary, is outside the authority of the tribal government. *See generally Blatchford,* 904 F.2d at 546–47. The courts have looked to non-Indian community cases and dependent Indian community cases when addressing either issue. *Id.* at 545–47.

**14.** More recent dictionary definitions are similar. *Webster's Third New International Dictionary* defines community as:

> 1: a body of individuals organized into a unit or manifesting usually with awareness some unifying trait: a: State, Commonwealth; b: the people living in a particular place or region and usually linked by common interests; c: a monastic body or other unified religious group; d: an interacting population of different kinds of individuals (as species) constituting a society or association or simply an aggregation of mutually related individuals in a given location.

Our analysis of these cases leads us to conclude the district court erred by focusing too narrowly on the mine site. The South McKinley Mine does not exist in a vacuum. Its workers must eat, sleep, shop, worship, and otherwise engage in life's daily routines. The governmental or private entities that originally established, and continue to provide, the infrastructure required for the mine's ongoing operation are necessarily relevant to the dependent Indian community inquiry.

The Navajo Nation argues the entire Tsayatoh Chapter should have been used as the community of reference. The resolution of this issue involves substantial factual determinations, making the district court the appropriate forum for its initial consideration. The Tsayatoh Chapter may prove to be the appropriate community of reference. However, there may also be a clearly identifiable community that includes the mine site but is smaller than the entire Tsayatoh Chapter. We leave this determination to the district court on remand.

### 2. THE *BLATCHFORD* TEST

In *Blatchford*, we described the standards defining a dependent Indian community. *Blatchford*, 904 F.2d at 544–49. We analyzed a variety of cases interpreting the statutory term. Our initial focus was our decision in *Martine*, where we approved the trial court's three-part inquiry: (1) the nature of the area in question; (2) the relationship of the inhabitants of the area to Indian tribes and to the federal government; and (3) the established practice of government agencies to the area. *Martine*, 442 F.2d at 1023. *Blatchford* continued by discussing "a series of cases elaborating on the parameters of dependent Indian community status [that] have emerged from within the Eighth Circuit." *Blatchford*, 904 F.2d at 546.

Since *Martine* was decided in 1971, the Eighth Circuit has modified our test by adding several additional factors. In *Blatchford*, we implicitly adopted our sister circuit's modified formulation of the appropriate inquiry. *Id.* at 546–49. We now explicitly adopt the Eighth Circuit's four-prong test for determining what constitutes a dependent Indian community under 18 U.S.C. § 1151(b):

[W]hether a particular geographical area is a dependent Indian community depends on a consideration of several factors. These include: (1) whether the United States has retained "title to the lands which it permits the Indians to occupy" and "authority to enact regulations and protective laws respecting this territory,"; (2) "the nature of the area in question, the relationship of the inhabitants in the area to Indian tribes and to the federal government, and the established practice of government agencies toward the area,"; (3) whether there is "an element of cohesiveness ... manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality,"; and (4) "whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples."

*South Dakota*, 665 F.2d at 839 (citations omitted). *Martine's* three factors appear as the second factor in the Eighth Circuit's test. The other circuits that have addressed this issue have followed this court's and the Eighth Circuit's lead. *See United States v. Levesque*, 681 F.2d 75 (1st Cir.), *cert. denied*, 459 U.S. 1089, 103 S.Ct. 574, 74 L.Ed.2d 936 (1982); *United States v. Cook*, 922 F.2d 1026 (2d Cir.), *cert. denied*, 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991); *Alaska v. Native Village of Venetie*, 856 F.2d 1384 (9th Cir.1988).[15]

15. Several state courts in the East have adopted an alternative test because of the historical differences in the relationship of the federal and state governments to Indians in the Eastern and Western United States throughout this nation's history. The competing test holds that a dependent Indian community exists if: (1) there is a bona fide tribe of Indians; and (2) the tribe has inhabited the land, has had "Indian title" to it since 1790, and has maintained the same status and nature of its occupancy from 1790 to the time the cause of action arose. *State v. Dana*, 404 A.2d 551, 562 (Me.1979), *cert. denied*, 444 U.S. 1098, 100 S.Ct. 1064, 62 L.Ed.2d 785 (1980). This test has also been adopted by Connecticut and Vermont. *Schaghticoke Indians of Kent, Conn., Inc. v. Potter*, 217 Conn. 612, 587 A.2d 139 (1991); *State v. St. Francis*, 151 Vt. 384, 563 A.2d 249 (1989). The Eastern test focuses on 1790 because that year the First Congress passed the

We leave to the district court the task of applying this test to the facts and circumstances of the instant dispute. We note, however, that our examination of the record on appeal reveals the Navajo Nation has presented evidence to satisfy its initial burden of demonstrating the South McKinley Mine is a dependent Indian community. Consequently, the district court may find there is sufficient evidence already in the record to conclude the mine lies within a dependent Indian community. This observation, however, is not binding on the district court but only offered to further explain the nature of its task on remand. The testimony and documentary evidence contained in the record reveal both significant detail and complexity. Our review of this issue would be substantially assisted by the district court's making specific, detailed factual findings on each of the four-prongs of the dependent Indian community inquiry. For example, under the second prong, both parties have presented evidence concerning the role of the Navajo Nation, the State of New Mexico, and the United States in providing for the basic needs of the inhabitants of the area. The evidence suggests the Navajo Nation and the state share the dual responsibility for education, social welfare, health care, emergency services, and road maintenance among other items. What is not clear from the record is whether the state or the Navajo Nation predominates in the provision of these services.

We believe the district court must assess the evidence and reach conclusions on such issues on remand.

## V. CONCLUSION

We remand to the district court on two issues. First, the district court must determine the appropriate community of reference for its dependent Indian community analysis. Second, after deciding that threshold issue, the district court must make specific, detailed factual findings on each of the four prongs of the dependent Indian community test. If the court concludes the South McKinley Mine site and the surrounding area constitutes a dependent Indian community, it must abstain until P & M exhausts all its available tribal remedies.[16]

**REVERSED AND REMANDED** for further proceedings.

---

Indian Trade and Intercourse Act, a comprehensive statute that regulated the new nation's and its component states' relationship with Indians. "Indian title" refers to the right of occupancy rather than sovereignty held by Indian tribes. *See generally Johnson v. M'Intosh,* 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823) (Marshall, C.J.). Two tests exist because the Supreme Court has never adopted its own test for determining a dependent Indian community and has denied certiorari in cases applying both of the competing versions.

**16.** Amicus Ray Powell, the Commissioner of the Public Lands for the State of New Mexico, argues the Navajo Nation has no authority to apply its Business Activities Tax on state trust lands. As noted above, New Mexico holds title to 64.09 acres or less than 0.5% of the mine site area. We have chosen not to address these arguments on appeal. Mr. Powell should advance them first to the district court on remand.