UNITED STATES of America, Appellee,

v.

STATE OF SOUTH DAKOTA, Appellant.

No. 80–2038.

United States Court of Appeals,
Eighth Circuit.

Submitted June 19, 1981.

Decided Dec. 9, 1981.

Terry L. Pechota, U. S. Atty. (argued), Bonnie P. Ulrich, Asst. U. S. Atty., Sioux Falls, S. D., for appellee.

Mark V. Meierhenry, Atty. Gen. (argued), Robert L. Timm, Chief Deputy Atty. Gen., LeAnn Larson Finke, Asst. Atty. Gen., Pierre, S. D., for appellant.

Bertram E. Hirsch, Bellerose, N. Y., for the Sisseton-Wahpeton Sioux Tribe as amicus curiae.

Before HENLEY and McMILLIAN, Circuit Judges, and COLLINSON,* Senior District Judge.

McMILLIAN, Circuit Judge.

The State of South Dakota appeals from a final judgment [1] entered in the District Court for the District of South Dakota [2] declaring a housing project located in the City of Sisseton, South Dakota, to be a "dependent Indian community" within the meaning of 18 U.S.C. § 1151(b),[3] and restraining the State of South Dakota from asserting jurisdiction over the project.

In this appeal the state argues that the district court erred in (1) not considering the entire City of Sisseton, rather than the project, as the proper community of reference, and (2) finding that the project was a dependent Indian community. The state also argues that the district court's holding is wrong as a matter of public policy. In response the United States argues generally that the evidence supports the district court's finding that the housing project is a

---

* The Honorable William R. Collinson, United States Senior District Judge for the Western District of Missouri, sitting by designation.

1. The action was brought by the United States in its own behalf and in its fiduciary capacity on behalf of the Sisseton-Wahpeton Sioux Tribe.

2. Trial in this case was held before the Honorable Fred J. Nichol, United States Senior District Judge for the District of South Dakota. The case was transferred and the parties stipulated that the Honorable Donald J. Porter, United States District Judge for the District of South Dakota, could decide the case on the record presented to Judge Nichol.

3. 18 U.S.C. § 1151(b) provides: "Except as otherwise provided in sections 1154 and 1156 of this title, the term 'Indian country,' ... means ... (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state."

dependent Indian community. For the reasons discussed below, we affirm the judgment of the district court.

The law underlying the concept of "dependent Indian community" was discussed by this court last year in *Weddell v. Meierhenry*, 636 F.2d 211 (8th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 2024, 68 L.Ed.2d 329 (1981), and need not be repeated at length here. In *Weddell* we concluded that whether a particular geographical area is a dependent Indian community depends on a consideration of several factors. These include: (1) whether the United States has retained "title to the lands which it permits the Indians to occupy" and "authority to enact regulations and protective laws respecting this territory," 636 F.2d at 212, *citing United States v. McGowan*, 302 U.S. 535, 539, 58 S.Ct. 286, 288, 82 L.Ed. 410 (1938); (2) "the nature of the area in question, the relationship of the inhabitants of the area to Indian tribes and to the federal government, and the established practice of government agencies toward the area," 636 F.2d at 212, *citing United States v. Martine*, 442 F.2d 1022, 1023 (10th Cir. 1971); (3) whether there is "an element of cohesiveness ... manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality," 636 F.2d at 212–13, *citing United States v. Morgan*, 614 F.2d 166, 170 (8th Cir. 1980); and (4) "whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples," 636 F.2d at 213, *citing United States v. Mound*, 477 F.Supp. 156, 158 (D.S.D.1979), *citing Youngbear v. Brewer*, 415 F.Supp. 807, 809 (N.D.Iowa 1976), *aff'd*, 549 F.2d 74 (8th Cir. 1977).

In the present case the district court applied the above principles in examining the evidence relating to the housing project. Because the facts are not in dispute, our statement of facts is based in substantial part on the district court's well-reasoned memorandum opinion.[4]

*Title to the Land*

The land where the housing project is located is within the original boundaries of the Lake Traverse Indian Reservation. The Reservation was terminated in 1891, and non-Indian lands were returned to the public domain. *DeCoteau v. District County Court*, 402 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). This parcel was never an Indian allotment, but was instead sold by the United States. The land eventually came into the possession of Saint Peter's Church of Sisseton, South Dakota, which transferred it to the United States in trust for the Sisseton-Wahpeton Sioux Tribe by warranty deed dated July 5, 1969. The deed contained the following conditions:

2. The land so transferred by this Corporation will be used exclusively for a Low Rent Housing Project and will not be used for any other purpose;

3. Any and all land or portion thereof transferred in this deed that is not used within five years from date of deed for said Low Rent Housing Project will revert to Grantor.

The project was constructed within the five-year period.

*Purpose of the Community*

The housing project originated under a Tribal Ordinance enacted pursuant to the Tribe's authority to provide for the health, safety, morals and welfare of the Tribe. By this Act, the Sisseton-Wahpeton Sioux Tribe established a subordinate body, the Sisseton-Wahpeton Housing Authority (Housing Authority). The stated purpose of the Housing Authority was to remedy the reservation problems of unsafe and unsanitary housing conditions and to alleviate the acute shortage of decent, safe and sanitary dwellings for families of low income.[5] Memorandum opinion at 4. The land in-

---

4. *United States v. South Dakota*, No. Civ. 77-1022 (D.S.D. Sept. 10, 1980) (unpublished).

5. The Tribe's Housing Authority administers approximately 600 housing units. Most of these units are located in thirteen separate housing developments. Approximately one-half of the Tribe's 4,000 members live in the units. Brief Amicus Curiae of the Sisseton-Wahpeton Sioux Tribe at 2.

volved here was leased by the Tribe to the Housing Authority for the purpose of constructing and operating a low rent housing project. The project was built with federal funds obtained through the Department of Housing and Urban Development (HUD).

*Relationship of the Community to the Tribe*

Members of the Board of Commissioners of the Housing Authority are appointed by the Tribal Council, may be removed by the Council for cause and must periodically report to the Council. Further, any future housing planned by the Housing Authority must be planned in consultation with the Tribal government, the Housing Authority must provide minutes of its meeting to the Council, and the Housing Director is considered part of the Tribal staff. In addition, in Article VIII of the Tribal Ordinance, the Tribe agreed that it would not levy taxes on the Housing Authority's projects, that it would furnish all Tribal services to the Housing Authority and its tenants, and that Tribal codes would be modified to help the Housing Authority's work.

The Tribe provides a broad range of social services to the project including a senior citizens program, a maternal and child health program, a canning program, bussing for Indian students in the project to Sisseton schools, and a Tribal food stamp and commodities program.

Evictions from the project are handled through Tribal court. Until shortly before trial, the Tribe provided police protection for the project.[6]

*Relationship of the Community to the Federal Government*

Many of the Tribal programs mentioned in the foregoing section are administered in cooperation with the federal government, through the Department of the Interior's Bureau of Indian Affairs (BIA) and the Department of Health and Human Services'

Indian Health Service (IHS). Federal concern for the project is shown by other action, such as an agreement entered into by the Tribe, the Housing Authority, IHS, and the City of Sisseton in 1970, under which IHS provided water and sewage facilities to the City of Sisseton for the housing project. IHS also undertook to provide a garbage truck to be used in collecting garbage from the project as well as the rest of Sisseton. IHS maintains a hospital in Sisseton which provides treatment to Tribal members, including those in the project, and all BIA programs on the Sisseton-Wahpeton Reservation are open to Tribal members in the project. The BIA has done road work in the project, in cooperation with the City of Sisseton.

Construction of the housing project was initially financed with money borrowed through HUD pending the sale of notes sold by the Housing Authority in its own name through HUD. The HUD Office of Indian Programs makes an annual contribution payment to the Housing Authority for debt service and overhead, to make up for the inability of the Housing Authority to collect enough rent to exist on its own. These contribution funds are specifically earmarked for Indian housing. In addition, the Office of Indian Housing makes engineering and architectural services available to the project.

*Relationship between the Federal Government and State Government*

Federal law requires that HUD projects reach cooperation agreements with local governments to obtain the basic governmental services to maintain the project. Reimbursement for these services are made through payments in lieu of taxes (PILOT), and such payments have been made by the Housing Authority for this project. Services provided by the City of Sisseton include snow removal for the streets in the project as well as some street and sidewalk repair.

---

**6.** From late 1970, when the project was first occupied, until the state court decision in *Mandan v. Sisseton-Wahpeton Sioux Tribal Police* (S.D. 5th Jud.Cir. 1977) (unreported), the Bureau of Indian Affairs and tribal police provided law enforcement for the project's residents. In

1977, in order to avoid confrontation with Roberts County law enforcement authorities, the Tribe stopped regular law enforcement in the project. Brief Amicus Curiae of the Sisseton-Wahpeton Sioux Tribe at 9.

The stop signs in the project belong to the City, although the speed signs appear to belong to the Housing Authority itself. While no city street connects with the project, the one road into the project is maintained by Roberts County. The project's sewer and water services are attached to the City's service, and maintenance on sewer and water lines at the project is done by the City. Finally, the City provides fire protection, charging the Housing Authority a separate fee for each visit.

It is also clear that the residents of the project have some social and economic connections with the City of Sisseton. Shopping is generally done in Sisseton, the Sisseton newspaper is delivered to the project, and the telephones in the project and Sisseton share the same prefix. Some of the tenants work in Sisseton and all tenants can vote in city elections if they are registered. The children in the project attend the Sisseton schools, and the tenants attend school functions. It should be pointed out, however, that the Sisseton schools have received federal funds under the Johnson-O'Malley Act, 26 U.S.C. §§ 452–454, to assist the education of the large number of Indian students in the school system.[7]

*Composition of the Community*

The members of the Housing Authority Board, though appointed by the Tribe, are not required to be members of the Tribe. At the time of trial all Board members were members of the Sisseton-Wahpeton Sioux Tribe.

Similarly, the Housing Authority does not discriminate in the selection of tenants on the basis of race.[8] The district court found that, at the time of trial, four of the eighty-three units were inhabited by non-Indians. The court noted that the percentage of non-Indian residents had declined since the project first opened.

The district court concluded that, based on the evidence as a whole, the housing project was a dependent Indian community within the meaning of 18 U.S.C. § 1151(b).

On appeal the state first argues that the entire City of Sisseton, rather than the housing project, is the proper community of reference for determining whether a dependent Indian community exists. In support the state reasons that the project lacks the cohesiveness that is essential to a community because it relies on the city, either directly or through cooperation agreements with the Housing Authority, for all vital services.

The state further argues that the effect of the district court's decision is to sanction de facto reestablishment of disestablished reservations which will result in "checkerboard jurisdiction." The state argues that this "checkerboard jurisdiction" will undermine law enforcement efforts and create a potential haven for criminals seeking to avoid apprehension by local and state authorities.

In response the United States argues that the state did not raise this argument at trial and further that the cohesiveness of the Sisseton-Wahpeton housing project and its residents is clearly demonstrated by the facts established at trial.[9]

We note that the state did not raise either of these arguments at trial. It is well settled that issues not raised in the trial court cannot be considered by this court as a basis of a reversal. *Singleton v.*

---

**7.** The Sisseton high school was built by the Bureau of Indian Affairs and is located on federal lands under Bureau jurisdiction.

**8.** The district court noted that it appears that HUD has taken the view that Tribal housing projects need not comply with the general non-discrimination HUD regulations, *citing* 24 C.F.R. § 805.105(b). Memorandum opinion at 9.

**9.** The United States also argues that the project is Indian country under 18 U.S.C. § 1151(a) which provides in relevant part: "the term 'Indian country,' ... means (a) all lands within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation." We need not reach that argument because we have determined that the project is a "dependent Indian community" under 18 U.S.C. § 1151(b).

*Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976), *citing Hormel v. Helvering*, 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941); *Morrow v. Greyhound Lines, Inc.*, 541 F.2d 713, 724 (8th Cir. 1976). In *Hormel v. Helvering*, 312 U.S. at 556, 61 S.Ct. at 721, the Court explained that the rule is "essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues . . . [and] in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence." The rule is adhered to save in exceptional cases where the obvious result "would be a plain miscarriage of justice," *id.* at 558, 61 S.Ct. at 722, or "inconsistent with substantial justice." Fed.R.Civ.P. 61. This is not such a case. Therefore we decline to consider the state's community of reference or checkerboard jurisdiction arguments.[10]

The state next argues that even if the project is a community, it is not a dependent Indian community for the following reasons: the Housing Authority does not restrict membership in the project to Indians; the continued existence of the project is contingent upon continued HUD financing; the federal government's only action toward the project was the acceptance of the trust; and state agencies have consistently asserted state jurisdiction over the project.

■■ The fact that a small number of non-Indians reside at the project does not defeat a finding of a dependent Indian community. "The test for determining what is a dependent Indian community must be a flexible one, not tied to any single technical standard such as percentage of Indian occupants." *United States v. Mound, supra,* 447 F.Supp. at 160; *see Youngbear v. Brewer, supra,* 415 F.Supp. 807. Moreover, this court has stated that "[c]ohesiveness or common interests can be more necessary to the existence of a community [within the meaning of 18 U.S.C. § 1151(b)] than can

mere density of population." *United States v. Morgan, supra,* 614 F.2d at 170. In the present case the district court found that, while the few non-Indians living at the project might be eligible for its services, the main beneficiaries of the project were the members of the Sisseton-Wahpeton Sioux Tribe. *See United States v. Mound, supra,* 477 F.Supp. 160. This court does not dispute the district court's finding and can see no reason why the project's obligation to accept non-Indians in order to obtain HUD financing would defeat federal jurisdiction over the community.

■■■ The fact that the existence of the project is contingent upon continued HUD financing is irrelevant. As the district court properly noted, all Indian country may ultimately lose that status but that does not mean that while land is within a reservation boundary, or while it is held in trust by the United States, 18 U.S.C. § 1151 does not apply. The important consideration is what the land in question is now, not what it may become in the future. *See United States v. Pelican,* 232 U.S. 442, 449–50, 34 S.Ct. 396, 399, 58 L.Ed. 676 (1914).

The state's contention that the only federal government action was the acceptance of the trust is erroneous. The district court specifically found that many of the Tribal programs provided to the project residents are provided under contract with the federal government, through the BIA and the IHS.

■ Finally, the fact that the state has asserted jurisdiction over the project does not necessarily defeat a finding of a dependent Indian community. *E.g., United States v. John,* 437 U.S. 634, 653, 98 S.Ct. 2541, 2551, 57 L.Ed.2d 489 (1978). Also, we note that the district court found that the Tribe had provided police protection for the project until the Roberts County Sheriff threatened to arrest Tribal policemen who attempted to enforce laws in the project. Memorandum opinion at 5.

---

10. We do note, however, that the district court found that the city services provided to the housing project are provided largely because of the inducements offered the city by federal agencies or by the Housing Authority.

The district court followed the proper approach in determining whether the Sisseton-Wahpeton housing project was a dependent Indian community under 18 U.S.C. § 1151(b). It received evidence as to the nature of the area in question, the relationship of the inhabitants of the project to the Tribe and to the federal government, the established practice of government agencies toward the area, and the cohesiveness of the community. The testimonies of the Tribal Chairman, the legal advisor for the Office of Indian Programs, and the Director of the Office of Indian Programs support the district court's holding.

In affirming the district court we are not expanding the definition of a dependent Indian community to include a particular locale merely because a small segment of the population consists of Indians receiving various forms of federal assistance. *See Weddell v. Meierhenry, supra,* 636 F.2d 211.

The judgment of the district court is affirmed.