USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1944 NARRAGANSETT INDIAN TRIBE OF RHODE ISLAND AND NARRAGANSETT INDIAN WETUOMUCK HOUSING AUTHORITY, Plaintiffs - Appellees, v. NARRAGANSETT ELECTRIC COMPANY, Defendant - Appellee. ____________________ STATE OF RHODE ISLAND, Defendant - Appellant. ____________________ No. 95-1945 NARRAGANSETT INDIAN TRIBE OF RHODE ISLAND AND NARRAGANSETT INDIAN WETUOMUCK HOUSING AUTHORITY, Plaintiffs - Appellees, v. NARRAGANSETT ELECTRIC COMPANY, Defendant - Appellee. ____________________ TOWN OF CHARLESTOWN, Intervenor - Appellant. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ernest C. Torres, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Rosenn,* Senior Circuit Judge, ____________________ and Lynch, Circuit Judge. _____________ _____________________ Alan M. Shoer, Special Assistant Attorney General, with whom _____________ Jeffrey B. Pine, Attorney General, James E. Purcell, Partridge, ________________ _________________ __________ Snow & Hahn, Phillip M. Sloan, Solicitor, Town of Charlestown, ____________ _________________ and Bruce N. Goodsell, Assistant Town Solicitor, were on brief __________________ for appellants. Randall L. Souza, with whom Fred A. Kelly, Jr., Peter V. ________________ ___________________ _________ Lacouture and Peabody & Brown were on brief for the Narragansett _________ _______________ Electric Company. John F. Killoy, Jr., with whom Law Office of H. Jefferson ____________________ ___________________________ Melish was on brief for the Narragansett Indian Tribe of Rhode ______ Island and the Narragansett Indian Wetuomuck Housing Authority. ____________________ July 22, 1996 ____________________  ____________________ * Of the Third Circuit, sitting by designation. -2- TORRUELLA, Chief Judge. Defendant-intervenors the town TORRUELLA, Chief Judge. ___________ of Charlestown (the "Town") and the State of Rhode Island (together, the "State") seek a permanent injunction prohibiting plaintiffs the Narragansett Indian Tribe (the "Tribe") and the Narragansett Indian Wetuomuck Housing Authority (the "WHA") from constructing a housing complex without obtaining various permits and approvals pursuant to state law and local ordinances.1 At the heart of the issue lies the question of whether the land in question is "Indian country" as that term is defined in 18 U.S.C. 1151(b). The district court found that it is, by virtue of being a dependent Indian community, and so declined in part to issue the injunction sought by the State and the Town. We, however, find it is not, and so, for the reasons stated herein, we reverse in part and affirm in part. BACKGROUND BACKGROUND The district court relied on the evidence presented at an evidentiary hearing regarding the State's motion for a preliminary injunction, which evidence the parties stipulated  ____________________ 1 This suit was initially brought by plaintiffs against the Narragansett Electric Company, a Rhode Island public utility corporation. Plaintiffs asserted subject matter jurisdiction under 28 U.S.C. 1331 and 1362. The State subsequently intervened in the lawsuit and filed a counterclaim for declaratory and injunctive relief against the plaintiffs, and it is the State's counterclaim that underlies this appeal. The Narragansett Electric Company takes no position with respect to the issues raised by the State in this appeal. We add that, because the plaintiffs have asserted no claims against the State, this action does not implicate Eleventh Amendment concerns, and the Supreme Court's decision in Seminole Tribe of Florida v. ___________________________ Florida, __ U.S. __, 116 S. Ct. 114 (1995) is inapposite here. _______ -3- could serve as the basis for the district court's decision.2 Narragansett Indian Tribe v. Narragansett Elec., 878 F. Supp. __________________________ ___________________ 349, 352 (D.R.I. 1995) ("Narragansett I"). As the parties raise ______________ no challenges to the district court's findings, we rely on them as well.3  In 1991 the WHA purchased the land which is at the center of this dispute (the "housing site") from a private developer. See id. at 534 (detailing history of purchase of the ___ ___ housing site). The housing site is adjacent to the Tribe's other lands, separated from them by a town road. The Tribe's church, the long house which serves as the seat of the Tribal Assembly, and the offices where the tribal government meets and programs for tribal members are administered are all established in close proximity to the housing site; a proposed tribal community center and tribal health center are to be constructed on the settlement lands as well. The approximately 32 acres of the housing site is located within the costal zone designated in the State's Coastal Resources Management Program ("CRMP"). Also, the section of the Town in which the housing site is located is zoned to require at least two acres of land per residential unit, a requirement the proposed project does not meet, as it will have some fifty units.  ____________________ 2 As the district court noted, the request for a permanent injunction we address here relates only to the construction of the housing complex. We do not express an opinion on any remaining portions of the case. 3 The parties do dispute whether the trust application has been withdrawn. However, as counsel for the Tribe agreed at oral argument, the record here simply shows that the application has been made and not acted on or withdrawn. -4- As the district court noted, although occupancy is open to anyone "it is contemplated that most, if not all of the units, will be occupied by elderly and low-income members of the Tribe." Id. ___ The United States Department of Housing and Urban Development ("HUD") has recognized the WHA as an Indian Housing Authority, and has provided the financing for the purchase of the housing site and the construction of the buildings. HUD will also provide money both for managing the project and for subsidizing the occupants' rent. The HUD funds have been made pursuant to a program designed to provide housing for Indians. See The Indian Housing Act of 1988, 42 U.S.C. 1437aa-1437ff.  ___ The WHA bought the land, and then conveyed it to the Tribe. A deed restriction requires that the land be placed in trust with the federal government, for the express purpose of providing housing for tribal members. The district court found that the Tribe had applied for trust status, but that the application had not yet been granted. Meanwhile, the land has been leased to the WHA, with the approval of the Bureau of Indian Affairs ("BIA"). The WHA began construction on the housing site without a building permit from the Town or state approval of the individual sewage disposal systems (the "ISDS") serving the project. Nor did the WHA "obtain any determination that the project is consistent with Rhode Island's CRMP or state regulations designed to preserve property of historical or archeological significance." Narragansett I, 878 F. Supp. at ______________ -5- 354. The district court found that the excavation for the project has infringed on the Town's drainage easement, and has threatened to alter drainage patterns to the detriment of coastal and groundwater resources. At the same time, however, the ISDS systems meet Indian Health Service ("IHS") regulations.4 "[T]he record is silent regarding the differences, if any, between the State's building code and the Tribe's building code or what the significance of any such differences may be." Id. at 355. ___ To further complicate the picture, "[t]he evidence demonstrates that the housing site is in close proximity to Ninigret Pond, a fragile salt water estuary that is a prime spawning ground for several species of commercially important fish." Id. The district court found that the pond is ___ "ecologically stressed" already, due to nitrates in the ground water, and that the possibility exists that nitrates from the WHA's ISDS systems could reach the pond "and worsen an already serious problem." Id. ___ In its detailed opinion, the district court concluded that the housing site is indeed a "dependent Indian community," and thus is Indian country under 18 U.S.C. 1151. Noting that "tribal sovereignty is no longer an absolute bar to the assertion of state authority in Indian country," Narragansett I, 878 F. ______________ Supp. at 359, the court carried out a pre-emption analysis. It concluded that the State's building and zoning regulations were  ____________________ 4 IHS is an agency of the Department of Health and Human Services. -6- pre-empted, as was its jurisdiction to regulate the ISDS systems. However, it found that Rhode Island's CRMP was not pre-empted, and accordingly enjoined the WHA and the Tribe from occupying buildings on the housing site unless that program's requirements were satisfied. It also enjoined them from interfering with the drainage easement previously conveyed to the Town.5 We review the grant of a permanent injunction under an abuse of discretion standard. See Caroline T. v. Hudson Sch. ___ ___________ ____________ Dist., 915 F.2d 752, 754-55 (1st Cir. 1990) (noting that abuse of _____ discretion standard applies to both preliminary and permanent injunctions); cf. Narragansett Indian Tribe v. Guilbert, 934 F.2d ___ _________________________ ________ 4, 5 (1st Cir. 1991) (applying abuse of discretion standard to grant of preliminary injunction).  DISCUSSION DISCUSSION A. The Settlement Act A. The Settlement Act __________________ The State makes its first argument on the basis of the Rhode Island Indian Claims Settlement Act of 1978, 25 U.S.C. 1701-1716 (the "Settlement Act"). We begin with the history of the Settlement Act, and then address the State's contention. 1. Background 1. Background __________ The background of the relationship between the Tribe and the State has been addressed in some detail by the district  ____________________ 5 The Tribe has not appealed from the district court's partial grant of injunctive relief. The court found that it did not need to make a determination regarding whether state regulations regarding property with historical and/or archeological significance applied, since the Rhode Island Historical Preservation Commission had notified the Tribe that it had no objection to the project as planned. -7- court below, Narragansett I, 878 F. Supp. at 353-55, as well as _______________ in prior decisions of the courts of this circuit, see Rhode ___ _____ Island v. Narragansett Indian Tribe, 19 F.3d 685, 689 (1st Cir.), ______ _________________________ cert. denied, __ U.S. __, 115 S. Ct. 298 (1994); Maynard v. ____________ _______ Narragansett Indian Tribe, 984 F.2d 14, 15-16 (1st Cir. 1993); __________________________ Town of Charlestown v. United States, 696 F. Supp. 800, 801-05 ____________________ ______________ (D.R.I. 1988), aff'd, 873 F.2d 1433 (1st Cir. 1989); Narragansett _____ ____________ Tribe of Indians v. Murphy, 426 F. Supp. 132, 134 (D.R.I. 1976); ________________ ______ Narragansett Tribe of Indians v. Southern R.I. Land Dev. Corp., ______________________________ ______________________________ 418 F. Supp. 798, 802-03 (D.R.I. 1976). Therefore, rather than enter into a detailed discussion, we will simply outline the essential structure of the historical underpinnings of the State's first argument. In the mid-1970s, the Tribe brought two actions to establish its right to possession of lands which it contended were unlawfully held by the State as well as private individuals and businesses. The ground for its claims was that the lands had been unlawfully alienated in violation of the Indian Nonintercourse Act, 25 U.S.C. 177. See Southern R.I. Land Dev. ___ _______________________ Corp., 418 F. Supp. at 802-03 (recounting history of dispute). _____ The parties to the dispute settled the claims in 1978 by entering into a Joint Memorandum of Understanding. The Tribe relinquished its title claims, and in return received a sum of money6 and  ____________________ 6 The Tribe notes that it disagrees with the district court's statement that the Tribe received a payment under the Settlement Act, maintaining that there was neither a payment to the Tribe nor a distribution of money or land to individual Tribe members. Whether or not the Tribe received a payment is irrelevant to our -8- effective control over some 1,800 acres of land, whose title was held by a corporation (the "settlement lands"). Implementing legislation was passed by the United States Congress in the form of the Settlement Act, and by the Rhode Island legislature as well, see Narragansett Indian Land Management Corporation Act, 6A ___ R.I. Gen. Laws 37-18-1 to 37-18-15 (1990). See generally Town _____________ ____ of Charlestown, 696 F. Supp. at 801-05 (detailing the history and ______________ provisions of the Settlement Act).  In 1983, the Narragansetts were officially recognized as an Indian tribe. See Narragansett Indian Tribe, 19 F.3d at ___ __________________________ 689. In 1988, the Tribe deeded the settlement lands to the BIA, to be held in trust. Id. This court has held that although the ___ Settlement Act allows State civil and criminal jurisdiction over the settlement lands, with some exceptions, the Tribe nonetheless has "concurrent jurisdiction over, and exercise[s] governmental power with respect to, those lands." Id. (holding that the ___ Indian Gaming Regulatory Act, 25 U.S.C. 2701-2721, 18 U.S.C. 1166-1168, applies to the settlement lands). 2. The Present Dispute 2. The Present Dispute ___________________ The State's first contention in the present case is that the Settlement Act precludes a finding that the housing site, which is not part of the settlement lands, is Indian country, because that Act resolved the Tribe's land claims and established the boundaries of the Tribe's Indian country in Rhode Island. It maintains that we should interpret section 1705(a)(3)  ____________________ consideration of the issue at hand. -9- of the Settlement Act as extinguishing all of the Tribe's claims and limiting the boundaries of its Indian country.7 The linchpin of its argument is its contention that it was Congress' intent in the Settlement Act to set definite limits to the Tribe's Indian country and to extinguish any claim to greater boundaries, and congressional intent must prevail. See Rosebud ___ _______ Sioux Tribe v. Kneip, 430 U.S. 584, 586 (1976) (noting "that ____________ _____ congressional intent will control" in determining whether a reservation has been terminated). Such a specific statute, it maintains, overrides the general definition of "Indian country." The Tribe responds with two counter-arguments. First, it maintains that the State effectively waived this argument by  ____________________ 7 The pertinent section provides that upon the State's compliance with the conditions of the Settlement Act, and the recognition of the same by the Secretary of the Interior,  by virtue of the approval of a transfer of land or natural resources effected by this section, or an extinguishment of aboriginal title effected thereby, all claims against the United States, any State or subdivision thereof, or any other person or entity, by the Indian Corporation or any other entity presently or at any time in the past known as the Narragansett Tribe of Indians, or any predecessor or successor in interest, member or stockholder thereof, or any other Indian, Indian nation, or tribe of Indians, arising subsequent to the transfer and based upon any interest in or right involving such land or natural resources (including but not limited to claims for trespass damages or claims for use and occupancy) shall be regarded as extinguished as of the date of the transfer. 25 U.S.C. 1705(a)(3). -10- making only passing reference to it in the court below, without supporting it with statutory analysis or legal authority. See ___ Rodr guez-Pinto v. Tirado-Delgado, 982 F.2d 34, 41 (1st Cir. _______________ ______________ 1993) (reaffirming that "arguments made in a perfunctory manner below are deemed waived on appeal").  Second, the Tribe contends that even if the argument was not waived, the Settlement Act only extinguished the Tribe's aboriginal title claims. "Aboriginal title," alternatively __________ called "Indian title," is "the right of Indian tribes to use and occupy 'lands they had inhabited from time immemorial.'" Mashpee _______ Tribe v. Secretary of the Interior, 820 F.2d 480, 481-82 (1st _____ ___________________________ Cir. 1987) (quoting County of Oneida v. Oneida Indian Nation, 470 ________________ ____________________ U.S. 226, 234 (1985)). The Tribe points out that this is not a title action, and that it does not claim aboriginal title to the housing site. Further, it notes that on the face of section 1705(a)(3), the Tribe agreed to "an extinguishment of aboriginal title," but there is no express language in the statute extinguishing any right to purchase other lands. If the Settlement Act did not abrogate the Tribe's right to purchase other lands, the Tribe continues, it did not limit its ability to gain sovereign authority over such lands that it acquires. The weight of this reading of the statute is heightened by the "distinctive perspective" from which we view statutes that "touch on Indian sovereignty." State of R.I., 19 F.3d at 691. "The ______________ congressional intent [to terminate a reservation] must be clear, to overcome 'the general rule that "[d]oubtful expressions are to -11- be resolved in favor of the weak and defenseless people who are the wards of the nation . . . ."'" DeCoteau v. District County ________ _______________ Court, 420 U.S. 425, 444 (1974) (quoting McClanahan v. Arizona _____ __________ _______ State Tax Comm'n, 411 U.S. 164, 174 (1973) (quoting Carpenter v. _________________ _________ Shaw, 280 U.S. 363, 367 (1930))). Paternalistic phrasing aside, ____ it is well established that "[a] congressional determination to terminate [a reservation] must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." Mattz v. Arnett, 412 U.S. 481, 505 (1973). _____ ______ The importance of this dispute over whether the Settlement Act terminates the Tribe's ability to increase the territory over which it possesses sovereignty is manifest. No matter how we hold, the significance of our decision will reach well beyond the confines of the current dispute. Indeed, in its brief the State points to at least one pending case in which the issue arises. Nonetheless, we leave this question, which the district court did not address in its lengthy opinion, for another day. Regardless of whether the issue has in fact been waived, we need not establish in this dispute whether the Settlement Act limits the Tribe's Indian country, as we conclude on independent grounds that the housing site is not a dependent Indian community, and therefore is not Indian country. Thus we will wait to address the issue on the basis of more developed discussion below; while it is at heart a question of statutory interpretation, we nonetheless prefer to address the Settlement -12- Act question at a time when the parties, and the court below, have addressed it more fully. -13- B. Indian Country B. Indian Country ______________ 1. The Significance of "Indian Country" 1. The Significance of "Indian Country" ____________________________________ Serving as the backdrop to this case is the doctrine that "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." Oklahoma Tax Comm'n v. Citizen Band Potawatomi ____________________ ________________________ Indian Tribe, 498 U.S. 505, 509 (1991) (citing Cherokee Nation v. ____________ _______________ Georgia, 5 Pet. 1, 17, 8 L.Ed. 25 (1831)); see McClanahan, 411 _______ ___ __________ U.S. at 168-69 (outlining the roots of the Indian sovereignty doctrine). This rule has softened over time, so that it is no longer true that state law plays no role within a tribe's territory. Nonetheless, the state's jurisdiction is not automatic. "[S]tate laws may be applied to tribal Indians on their reservations if Congress has expressly so provided," California v. Cabazon Band of Mission Indians, 480 U.S. 202, 207 __________ _______________________________ (1987); where Congress does not so provide, a pre-emption analysis is followed to determine if state law is pre-empted by federal and tribal interests as reflected in federal law. See ___ id. at 216; DeCoteau, 420 U.S. at 427 & n.2; McClanahan, 411 U.S. ___ ________ __________ at 172. In short, "it would vastly oversimplify the problem to say that nothing remains of the notion that reservation Indians are a separate people to whom state jurisdiction . . . may not extend." McClanahan, 411 U.S. at 170. Therefore, the issue here __________ of whether the housing site is Indian country bears real significance, since "the Indian country classification is the -14- benchmark for approaching the allocation of federal, tribal, and state authority with respect to Indians and Indian lands." Indian Country, U.S.A. v. Oklahoma Tax Comm'n, 829 F.2d 967, 973 _______________________ ___________________ (10th Cir. 1987) (collecting cases), cert. denied sub nom. ________________________ Oklahoma Tax Comm'n v. Muscogee (Creek) Nation, 487 U.S. 1218 ____________________ ________________________ (1988); see Oklahoma Tax Comm'n v. Sac and Fox Nation, 508 U.S. ___ ___________________ __________________ 114, 125 (1993) (rejecting argument that Indian sovereignty only applies to formal reservation lands, stating "we ask only whether the land is Indian country"); Cohen's Handbook of Federal Indian __________________________________ Law 27 (1982 ed.) ("[F]or most jurisdictional purposes the ___ governing legal term is 'Indian country.'"). If the housing site is not Indian country, there is no bar to the exercise of the State's jurisdiction. If it is, the State presumptively lacks jurisdiction to enforce the regulations and ordinances discussed here, and we must carry out a pre-emption analysis.  2. The Section 1151 Definition of "Indian Country" 2. The Section 1151 Definition of "Indian Country" _______________________________________________ The obvious question, then, is what constitutes "Indian country." Congress has defined the term as including (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, . . . (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments . . . . 18 U.S.C. 1151; see Oklahoma Tax Comm'n v. Sac and Fox Nation, ___ ___________________ __________________ 508 U.S. 114, 123 (1993) (noting broad nature of definition); United States v. Levesque, 681 F.2d 75, 77 (1st Cir.) (discussing _____________ ________ -15- origins of 1151(b)), cert. denied, 459 U.S. 1089 (1982); Alaska ____________ ______ v. Native Village of Venetie Tribal Gov't, 1995 WL 462232, *1-*5 ______________________________________ (D.Alaska Aug. 2, 1995) (detailing the history of the concept of Indian country). Here, as the housing site is neither part of a formal reservation nor an allotment, the present dispute is over whether it constitutes a "dependent Indian community" for purposes of subsection (b) of section 1151, a dispute we discuss at length below. Before addressing that issue, however, we recognize that, as the State notes, section 1151 on its face is concerned only with criminal jurisdiction. Nonetheless, the Supreme Court has repeatedly stated that the definition provided in section 1151 "applies to questions of both criminal and civil jurisdiction." Cabazon Band of Mission Indians, 480 U.S. at 207; _______________________________ see also DeCoteau, 420 U.S. at 427. Elsewhere, the Court has ________ ________ simply defined "Indian country" in civil cases in terms closely paralleling those of section 1151, while citing to that statute. See Oklahoma Tax Comm'n v. Chickasaw Nation, __ U.S. __, 115 S. ___ ___________________ ________________ Ct. 2214, 2217 n.2 (1995); Sac and Fox, 508 U.S. at 123. Other ___________ circuits have followed suit. See, e.g., Buzzard v. Oklahoma Tax ___ ____ _______ ____________ Comm'n, 992 F.2d 1073, 1076 (10th Cir.), cert. denied sub nom. ______ ______________________ United Keetoowah Band of Cherokee Indians v. Oklahoma Tax Comm'n, _________________________________________ ___________________ __ U.S. __, 114 S. Ct. 55 (1993); Alaska v. Native Village of ______ _________________ Venetie, 856 F.2d 1384, 1390 (9th Cir. 1988); Indian Country, _______ _______________ U.S.A., 829 F.2d at 973; see also United States v. South Dakota, ______ ________ ______________ ____________ 665 F.2d 837, 838 n.3 (8th Cir. 1981) (applying 1151 in -16- determining whether a housing project was a dependent Indian community), cert. denied, 459 U.S. 823 (1982). It appears _____________ manifest that we can, and should, do the same. The State would have us conclude otherwise. First, it calls our attention to Confederated Tribes and Bands of the ________________________________________ Yakima Nation v. County of Yakima, 903 F.2d 1207 (9th Cir. 1990), _____________ ________________ aff'd on other grounds, 502 U.S. 251 (1992). In that case, the _______________________ Ninth Circuit refused to apply section 1151 to the question of whether fee patented land could be taxed by the state. The court's refusal was based on the reality that, on its terms, section 1151 is a criminal statute, as well as the fact that the taxing power at issue was governed by a noncriminal federal statutory scheme. Id. at 1215. The Yakima court made its brief ___ ______ analysis without mentioning any of the Supreme Court cases cited above. The State looks to Yakima as support for its argument ______ that to transplant section 1151 into the civil context would go against both the plain meaning of the statute and congressional intent. We reject the State's suggestion that we follow the Ninth Circuit's logic in Yakima, since to the extent that case ______ supports the conclusion that section 1151 only applies in criminal cases,8 it directly contradicts the guidance of the  ____________________ 8 The parties did not discuss the fact that the Supreme Court has affirmed and remanded the holding in Yakima, see 502 U.S. at ______ ___ 251, perhaps because the Court did not directly address the Ninth Circuit's discussion of section 1151. That section is cited only twice in the Court's decision. It first appears, without real comment, in the majority's summation of the Yakima Nation's argument that section 6 of the Indian General Allotment Act of 1887 is a dead letter. 502 U.S. at 260 (citing the 1948 passage of section 1151 with its definition of Indian country as -17- Supreme Court. See Chickasaw Nation, 115 S. Ct. at 2217 n.2; Sac ___ ________________ ___ and Fox, 508 U.S. at 123; Cabazon Band of Mission Indians, 480 _______ ________________________________ U.S. at 207; DeCoteau, 420 U.S. at 427; see also Pittsburg & ________ ________ ___________ Midway Coal Mining Co. v. Watchman, 52 F.3d 1531, 1540 (10th Cir. ______________________ ________ 1995) (rejecting argument that definition only applies in criminal cases). Second, the State delves into the Supreme Court cases that provide that section 1151 applies in the civil context, attempting to distinguish them from the present case, questioning their logic and underpinnings, and concluding that the premise that section 1151 is relevant in determining a state's civil regulatory authority is in "serious question." We need not address these arguments in detail. See Watchman, 52 F.3d at 1540 ___ ________ n.10 (rejecting similar arguments). Aside from the fact that the Court reiterated its reliance on section 1151 for questions of civil jurisdiction as recently as 1995, see Chickasaw Nation, 115 ___ ________________ S. Ct. at 2217 n.2, we see no reason why the Court should not  ____________________ impliedly repealing section 6's jurisdictional grant). Next, in his separate opinion, Justice Blackmun notes that the majority conceded that section 6 can no longer be read as providing plenary jurisdiction over Indians who reside on reservation fee lands. 502 U.S. at 271 (Blackmun, J., concurring in part and dissenting in part). In support of that position, he cites to DeCoteau, 420 U.S. at 427 n.2, for the premise that the section ________ 1151 definition "demarcates [the] general boundary of civil jurisdiction of States." Id. ___  Since the Supreme Court's opinion in Yakima gives no ______ indication that the Court either agrees with the Ninth Circuit's discussion of section 1151 or is calling its own prior statements into doubt, and since it has subsequently reaffirmed that the definition carries into an analysis of civil jurisdiction, see ___ Chickasaw Nation, 115 S. Ct. at 2217 n.2, we will continue to ________________ follow the Court's guidance on the application of section 1151. -18- seize on the definition Congress has offered of what constitutes Indian country in the context of criminal jurisdiction to inform its analysis of Indian country in questions of civil jurisdiction. See Cohen's Handbook of Federal Indian Law 28 ___ _________________________________________ (noting historical and statutory support for Supreme Court application of 1151 to questions of civil jurisdiction).  3. Dependent Indian Communities 3. Dependent Indian Communities ____________________________ With the background set out and our standard of review established, we turn to the central issue of whether the housing site constitutes a "dependent Indian community." We note that the question of whether land owned by an Indian tribe may fall within a state's civil regulatory jurisdiction appears to be one of first impression in this circuit. See Narragansett I, 878 ___ ______________ F. Supp. at 352.  The inclusion of "dependent Indian communities" in the definition of Indian country dates to Supreme Court cases from the early part of this century. See United States v. Sandoval, ___ _____________ ________ 231 U.S. 28, 46 (1913) ("[L]ong continued legislative and executive usage and an unbroken current of judicial decisions have attributed to the United States as a superior and civilized nation the power and the duty of exercising a fostering care and protection over all dependent Indian communities within its borders . . . ."); see also United States v. McGowan, 302 U.S. _________ _____________ _______ 535, 538-39 (1938). Exactly what constitutes a "dependent Indian community," however, has not been defined. Instead, courts addressing the question conduct "a functional inquiry into the -19- nature of the community," weighing a series of factors established by case law. Levesque, 681 F.2d at 77.  ________ While we have not previously faced the precise issue raised here, in United States v. Levesque we addressed whether a _____________ ________ region is a dependent Indian community for the purposes of criminal jurisdiction, framing our focus in terms of whether the land is "both 'Indian' in character and federally dependent." See id. at 77. In that case, we applied the factors set out by ___ ___ the Tenth Circuit in United States v. Martine, 442 F.2d 1022 ______________ _______ (10th Cir. 1971), namely: the nature of the area in question; the relationship of the inhabitants of the area to Indian Tribes and the federal government, and the established practice of government agencies toward the area. Id. at 1023 (drawing factors from the discussion in Sandoval, 231 ___ ________ U.S. at 45-49). Other cases determining whether an area constitutes a dependent Indian community, including Tenth Circuit decisions, have relied on additional factors introduced into the case law by the Eighth Circuit in United States v. South Dakota, _____________ ____________ 665 F.2d 837 (8th Cir. 1981). See, e.g., Watchman, 52 F.3d at ___ ____ ________ 1545 (adopting the South Dakota additions to the Martine list of ____________ _______ factors); Blatchford v. Sullivan, 904 F.2d 542, 547 (10th Cir. __________ ________ 1990), cert. denied, 498 U.S. 1035 (1991); United States v. _____________ ______________ Azure, 801 F.2d 336, 339 (8th Cir. 1986); Housing Auth. of the _____ _____________________ Seminole Nation v. Harjo, 790 P.2d 1098, 1100 (Okla. 1990). ________________ _____ Following their lead, we shall expand upon our discussion in Levesque to incorporate the South Dakota factors. See Martine, ________ ____________ ___ _______ -20- 442 F.2d at 1024 (noting that additional relevant factors may be considered).  Thus, our first factor is "whether the United States has retained 'title to the lands which it permits the Indians to occupy' and 'authority to enact regulations and protective laws respecting this territory.'" South Dakota, 665 F.2d at 839 ____________ (quoting Weddell v. Meirhenry, 636 F.2d 211 (8th Cir. 1980), _______ _________ cert. denied, 451 U.S. 941 (1981)). The second South Dakota _____________ ____________ factor encompasses the Martine factors, set out above. Id. Our _______ ___ third consideration is "whether there is 'an element of cohesiveness . . . manifested either by economic pursuits in the area, common interests, or needs of the inhabitants as supplied by that locality.'" Id. (quoting Weddell, 636 F.2d at 212-13). ___ _______ The final South Dakota factor asks "'whether such lands have been ____________ set apart for the use, occupancy and protection of dependent Indian peoples.'" Id. (quoting Weddell, 636 F.2d at 213). ___ _______ Roughly speaking, the second and third factors weigh whether there is, in fact, an Indian community, and the first and fourth whether it is a dependent one. We accordingly address them in that order, ultimately concluding that the facts reveal that the housing site is not a dependent Indian community. The Martine Factors The Martine Factors ___________________ The Martine factors mandate that a court "weigh the _______ nature of the area in question; the relationship of the inhabitants of the area to Indian Tribes and the federal government, and the established practice of government agencies -21- toward the area." Martine, 442 F.2d at 1023. These _______ considerations support the Tribe's contention by demonstrating that the housing site is a community. First, as the district court noted, the BIA has recognized the housing site is in an area "in which 'a distinct [Indian] community has existed since earliest European contact.'" Narragansett I, 878 F. Supp. at 536 (quoting BIA Internal _______________ Memorandum on Acknowledgement of Narragansett Indian Tribe, July 1982, at 9). While we recognize that fact, however, we also note that it cannot be doubted that the Settlement Act extinguishes all claim to aboriginal title to the housing site. See 25 U.S.C. ___ 1705(a)(3). This factor, then, does not weigh in favor of the Tribe. In contrast, we do not doubt that there will be a significant relationship between the inhabitants of the housing site and the Tribe: indeed, the entire point of the project is to establish housing for Tribe members and to serve as "a means of bringing the Narragansetts back together." Narragansett I, ______________ 878 F. Supp. at 356. This weighs in favor of the Tribe.  Further, some relationship has been established between the federal government, in the form of HUD, IHS, and the BIA, and the housing site. HUD financed the purchase of the housing site, and recognizes the WHA as an Indian Housing Authority. It will provide monies for the management of the project and subsidize the occupants' rent, all pursuant to a program "specifically designed to provide housing for Indians." Narragansett I, 878 F. ______________ Supp. at 354; see South Dakota, 665 F.2d at 840 (remarking upon ___ ____________ -22- similar governmental activity as showing "[f]ederal concern for the [housing] project"). The district court noted that the fact that there is a relationship between HUD and the community "is underscored by the evidence that many of the occupants will participate in nutrition, education and job training programs subsidized by the federal government and administered by the Tribe on the adjacent settlement lands." Narragansett I, 878 F. ______________ Supp. at 357. However, we note that, as we find below, while a relationship exists to the extent that these federal entities are active in the housing site, their actions do not rise the level of setting apart the land for the use, occupancy, and protection of dependent Indian peoples. Cohesiveness Cohesiveness ____________ We next weigh whether there is an element of cohesiveness in the community, as demonstrated by economic pursuits, common interests, or the needs of the inhabitants. See ___ Weddell, 636 F.2d at 211 (noting that these elements are more _______ important than density of population, percentage of Indian residents, or the history and background of the area). Certainly this factor weighs in favor of finding this a dependent Indian community: the project will help the Tribe supply housing to its elderly and low-income members.9 Further, the housing site is in close proximity to the Tribe's church, the seat of the Tribal  ____________________ 9 The fact that occupancy is actually open to anyone, pursuant to HUD regulations, does not bar finding this a dependent Indian community. See South Dakota, 665 F.2d at 842 ("The fact that a ___ ____________ small number of non-Indians reside at the project does not defeat a finding of a dependent Indian community."). -23- Assembly, the offices of the tribal government and the administration of federal programs -- in short, it is indeed close to the "center of tribal government, culture and religious life." Narragansett I, 878 F. Supp. at 356. Nonetheless, the ______________ fact that the housing will be predominantly Indian in character is not enough, by itself, to establish the presence of a dependent Indian community. See Blatchford, 904 F.2d at 549 ___ __________ (noting that fact that "Indians constituted the bulk of the population and gave the area a distinctly Indian character does not convert the community into a dependent Indian community"); Martine, 442 F.2d at 1024 (holding that "[t]he mere presence of a _______ group of Indians in a particular area" does not make it a dependent Indian community). Title and Authority Title and Authority ___________________ We turn now to the South Dakota factors which focus on ____________ whether the community is in fact a dependent one. First, we ask whether the United States retains title to the housing site and the authority to enact regulations and laws. As noted above, the federal government does not in fact hold title; rather, the housing site is held by the Tribe, who has leased the land to the WHA, in a lease approved by the BIA. While the Tribe has applied for trust status, as the record stands, that status has not been granted. The fact that the Tribe, not the government, owns the land does not preclude a finding that the housing site is a dependent Indian community. See Sandoval, 231 U.S. at 48 ___ ________ (rejecting the argument that Pueblo Indians holding fee simple -24- title to lands precludes the lands from being Indian country); Martine, 442 F.2d at 1023 (finding that lands purchased by Navajo _______ Tribe from third party, located in an area which is "a patchwork of land, some of which is owned by the Navajo Tribe, some of which is not" and which is not within a reservation, was a dependent Indian community); cf. Indian Country, U.S.A., 829 F.2d ___ ______________________ at 975 (noting that patented fee title does not preclude finding territory is a reservation where fee title to the disputed area had passed to the Creek Nation by federal treaty). Nonetheless, this must weigh against the Tribe. See Blatchford v. Sullivan, ___ __________ ________ 904 F.2d 542 (10th Cir. 1990) (considering, inter alia, fact that __________ private owner held land in determining that land was not dependent Indian community, although it was surrounded by Navajo allotment land); Weddell, 636 F.2d at 213 (noting, inter alia, _______ __________ that although land was within the exterior boundaries of the original Yankton Sioux Indian Reservation, it was privately held, and finding that the land was not a dependent Indian community for purposes of criminal jurisdiction). The second part of this factor focuses upon the very issue in dispute here: who has the authority to enact regulations and laws. The State's authority will be determined by our decision here. As for the federal government, the record indicates that it has exercised authority in the form of HUD, IHS, and BIA activity, regulations and financing. Of course, HUD, at least, can provide financing and set regulations in other, non-Indian contexts. The record does not address whether -25- there is more extensive federal regulation here by HUD than in any other HUD assisted, non-Indian project. Since this factor is largely determined by our decision today, we find it weighs neither for nor against the Tribe. Whether the Lands Have Been Set Apart Whether the Lands Have Been Set Apart _____________________________________ The last factor we address is whether the housing site has been set apart by the federal government for the use, occupancy, and protection of dependent Indian peoples. This proves to be the crucial factor in our discussion. See Levesque, ___ ________ 681 F.2d at 77 (noting that this is the "ultimate issue" in the factual analysis). [T]he test for determining whether land is Indian country does not turn upon whether that land is denominated "trust land" or "reservation." Rather, we ask whether the area has been "'validly set apart for the use of the Indians as such, under the superintendence of the Government.'" Citizen Band Potawatomi Indian Tribe, 498 U.S. at 511 (quoting _____________________________________ United States v. John, 437 U.S. 634, 648-49 (1978)); see Sac and _____________ ____ ___ ________ Fox, 113 S. Ct. at 1991; Cohen's Handbook of Federal Indian Law ___ _______________________________________ 34 ("[T]he intent of Congress, as elucidated by [Supreme Court decisions], was to designate as Indian country all lands set aside by whatever means for the residence of tribal Indians under federal protection, together with trust and restricted Indian allotments."). Indeed, the Tenth Circuit regards this factor as a sufficient measure of whether land is Indian country. See ___ Buzzard, 992 F.2d at 1076 (noting the existence of 1151, but _______ applying only the "set apart for the use of Indians" test in -26- determining whether land was Indian country). The district court found that the housing site met this factor's criteria.  Although the United States does not hold title to the land and did not vest control over it in the Tribe, HUD has, in a manner of speaking, set the land apart for occupancy by elderly and low-income members pursuant to a need recognized both by HUD and the Tribe. Narragansett I, 878 F. Supp. at 356. For the reasons discussed ______________ below, we disagree. Our first question must be what constitutes setting land apart. As with the concept of dependent Indian communities, there is no established definition. Having surveyed the case law, however, we agree with the Tenth Circuit's suggestion that "land is 'validly set apart for the use of Indians as such' only if the federal government takes some action indicating that the land is designated for use by Indians." Buzzard, 992 F.2d at _______ 1076 (quoting Citizen Band Potawatomi Indian Tribe, 498 U.S. at _____________________________________ 649 (quoting John, 437 U.S. at 649)). In other words, ____ "[s]uperintendence by the federal government, and the consequential political dependence on the part of the tribe, exists for purposes of section 1151(b) where the degree of congressional and executive control over the tribe is so pervasive as to evidence an intention that the federal government, not the state, be the dominant political institution in the area." Native Village of Venetie, 1995 WL 462232, at *14. _________________________ We do not find evidence of such control here. -27- Were the land placed in trust with the United States, this factor would have been met. Taking land in trust is a considered evaluation and acceptance of responsibility indicative that the federal government has "set aside" the lands. [T]rust land is set apart for the use of Indians by the federal government because it can be obtained only by filing a request with the Secretary of the Interior, who must consider, among other things, the Indian's need for the land, and the purposes for which the land will be used. If the request is approved, then the United States holds the land as trustee. . . . . . . In addition, before agreeing to acquire trust land, the Secretary must consider several factors including the authority for the transactions, the impact on the state resulting from the removal of the land from the tax rolls, and jurisdictional problems that might arise.  Buzzard, 992 F.2d at 1076 (citations omitted). Additionally, _______ counsel for the Tribe admitted at oral argument that had the land been taken into trust by the United States, the issue of civil and criminal jurisdiction would have been addressed. The considerations made in the trust process demonstrate that "when the federal government agrees to hold land in trust, it is prepared to exert jurisdiction over the land." Id.  ___ Indeed, we note that in three of the four cases we have found where a court held that a housing project constituted a dependent Indian community, the land was held in trust, with the participation of HUD and an Indian housing authority. See United ___ ______ States v. Driver, 945 F.2d 1410, 1415 (8th Cir. 1991), cert. ______ ______ _____ denied, 502 U.S. 1109 (1992); South Dakota, 665 F.2d at 839; ______ ____________ -28- Mound, 447 F.2d at 158. In the fourth, Housing Authority of the _____ _________________________ Seminole Nation v. Harjo, Josephine Harjo inherited a restricted _______________ _____ Indian allotment from her husband, also a Tribe member. In 1973 she partitioned four tracts from the larger tract and deeded them to the Seminole Housing Authority, as part of a federally-funded program whereby Harjo would make payments each month and, in seventeen years, would own the house and the land. Although the United States did not have title to the deeded lands, it continued its "superintendence" of the property for the seventeen years of the program, a role evident in the comprehensive federal regulations governing the program. 790 P.2d at 1101. Thus the court found that the government "controls virtually every foreseeable legal consideration touching the property until the [program] runs its course or sooner terminates." Id. at 1102. ___ Although HUD regulations apply in the present case as well, the Tribe has pointed to no such comprehensive superintendence. Further, although the lands in Harjo were not held in trust, they _____ were not purchased from third parties, as in the present case. Instead, they were originally part of Harjo's restricted Indian allotment, and the portions of the allotment she did not use remained restricted, a much closer link to government control then the Tribe demonstrates here. In fact, we note that, aside from Harjo, the vast _____ majority of cases we have found which analyze what constitutes a dependent Indian community since 1151(b) was enacted find there is such a community if the land is held in trust, Driver, 945 ______ -29- F.2d at 1415; Azure, 801 F.2d at 339; South Dakota, 665 F.2d at _____ ____________ 839; Mound, 477 F. Supp. at 158; or as settlement lands, _____ Youngbear v. Brewer, 415 F. Supp. 807, 809 (N.D.Iowa 1976), _________ ______ aff'd, 549 F.2d 74 (8th Cir. 1977). Similarly, in Levesque, we _____ ________ found a dependent Indian community where the land was held by a newly recognized Indian tribe as part of their reservation. Levesque, 681 F.2d at 78. On the other hand, we note that in ________ most of the cases we found where land was privately held, even if by a tribe, the courts found there was not a dependent Indian community. See Buzzard, 992 F.2d at 1075 (involving land ___ _______ purchased by tribe); Blatchford, 904 F.2d at 548 (addressing __________ privately held land surrounded by Navajo allotment land); Weddell, 636 F.2d at 213 (involving independent municipal _______ corporation on former Indian reservation); United States v. ______________ Oceanside Okla., Inc., 527 F. Supp. 68, 69 (W.D.Okla. 1981) ______________________ (addressing land held in fee by non-Indians); Native Village of __________________ Venetie, 1995 WL 462232, at *15 (after settlement act _______ extinguished aboriginal claims, fee held by Native Village of Venetie Tribal Government). But see Martine, 442 F.2d at ________ _______ 1023.10 Thus the facts that the housing site is not held in  ____________________ 10 We note that in its brief discussion in Martine, the Tenth _______ Circuit did not consider whether the lands had been "set apart." 442 F.2d at 1023-24. Later decisions in that circuit, however, have incorporated the South Dakota factors in their analysis. ____________ See Watchman, 52 F.3d at 1545 (adopting the South Dakota ___ ________ _____________ additions to the Martine list of factors); see also Blatchford, _______ ________ __________ 904 F.2d at 544-49 (discussing development of the case law and conducting factual analysis). Indeed, in Buzzard, the court _______ relied solely on the "validly set apart" definition of Indian country, eschewing analysis under section 1151. Buzzard, 992 _______ F.2d at 1076-77. -30- trust or as settlement lands, and that the federal government does not exercise some similar level of control over the land, weigh against the Tribe. The Tenth Circuit's analysis in Buzzard v. Oklahoma Tax _______ ____________ Commission also weighs against finding the housing site meets the __________ "set apart" requirement. In Buzzard, as here, the Indian tribe _______ unilaterally purchased the lands in dispute, and held title to them in fee simple. Instead of housing, it set up commercial smokeshops on the land. The tribe claimed that the land was Indian country because it had been set apart by the federal government for the use of the Indians. In support of its position, it pointed to a clause in its charter and in 25 U.S.C. 177 providing that land owned by a tribe cannot be disposed of without the approval of the Secretary of the Interior -- a restraint on alienation that the Tribe acknowledges applies here as well. The Buzzard court rejected the tribe's argument, _______ finding that a restriction on alienation by itself is insufficient to make the land Indian country.  If the restriction against alienation were sufficient to make any land purchased by the [tribe] Indian country, the [tribe] could remove land from state jurisdiction and force the federal government to exert jurisdiction over that land without either sovereign having any voice in the matter. Nothing in McGowan or the cases concerning trust _______ land indicates that the Supreme Court intended for Indian tribes to have such unilateral power to create Indian country. 992 F.2d at 1076. Of course, in the present case we have an -31- additional element: HUD and BIA financial assistance and supervision of a housing project that is more clearly tied to the community's benefit than the smokeshops in Buzzard. Nonetheless, _______ the court's concern in Buzzard with unilateral creation of Indian _______ country remains a valid one in this case as well.  Ultimately, as in Buzzard, we find that the federal _______ role in the WHA project is simply not sufficient to establish that the housing site was "set apart" by the federal government. Our analysis of the facts here, as well as the facts other courts have found determinative in deciding whether land has been "set apart," leads us to conclude that the district court's holding that the housing site had been set apart constituted an abuse of its discretion. See Planned Parenthood League of Mass. v. ___ _____________________________________ Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981) (noting that ________ "'misapplication of the law to particular facts is an abuse of discretion.'" (quoting Charles v. Carey, 627 F.2d 772, 776 (7th _______ _____ Cir. 1980)). We conclude that without this final factor being in place, we cannot find that the housing site is a dependent Indian community. See Levesque, 681 F.2d at 77 (stating that "whether ___ ________ the area was established for the use, occupancy and protection of dependent Indians" is the "ultimate issue" in our fact-based inquiry). While the first two factors we addressed support the Tribe's contention that the housing site is a community of Indians, the second two demonstrate that it is not a "dependent" one. Without federal ownership of the land, as required in the -32- first South Dakota factor, or federal action sufficient to "set _____________ aside" the land, as required in the fourth, we cannot find on these facts that the "dependent" aspect of the concept of a dependent Indian community has been established. See United ___ ______ States v. Adair, 913 F. Supp. 1503, 1515 (E.D.Okla. 1995) ______ _____ ("Although the government's retention of title . . . or government title in trust for an Indian tribe, does not in and of itself establish an area as a "dependent Indian community . . . , without such title, consideration of the other . . . factors should be unnecessary."); Native Village of Venetie, 1995 WL ___________________________ 462232, at *13 (noting that the question of whether there is federal superintendence "brings into play the 'dependent' component").  Put simply, it is too far a stretch to regard the government agency funding and oversight here as evidencing a federal intent to give the tribe presumptive sovereignty over the housing site by making it Indian country.11 It seems implausible that a tribe could obtain a valid claim to Indian country -- and thus presumptive sovereignty rights -- over theretofore privately-held lands just by purchasing them and obtaining financial and other assistance from the government for their development, without any opportunity for involvement by the state, any negotiated agreements with respect to jurisdiction  ____________________ 11 Indeed, outside of the context of tribal disputes, the granting of a HUD subsidy to a housing project would not be viewed as evidence of a federal intention to preempt the operation of all other state laws. -33- over the land, or considered analysis by the federal government such as the one described for the placement of lands in trust. Viewed more reasonably, the federal action here at best evidences an intent to assist in the development of affordable housing for use by Tribe members, without necessarily incurring a commitment to exercise jurisdiction and "superintendence" over all activities on that land, whether related to housing or not, to the presumptive exclusion of state laws. CONCLUSION CONCLUSION For the above reasons, we hold that the district court's denial of the request for a permanent injunction insofar as it was based on the plaintiffs' failure to comply with the requirements of any State regulations promulgated pursuant to the Historic Preservation Act, the Clean Water Act, the Safe Drinking Water Act and those provisions of the Rhode Island building code and Charlestown Zoning Ordinance is reversed, and the district reversed ________ court shall enter an order granting the injunction. The district court's grant of the request for a permanent injunction of plaintiffs from occupying or permitting occupation of any buildings constructed or to be constructed on the housing site unless and until all applicable requirements of Rhode Island's Coastal Resources Management Program have been satisfied and from interfering with the drainage easement previously conveyed to the Town of Charlestown is affirmed. affirmed ________ -34-